## NEW MEXICO ET AL. v. MESCALERO APACHE TRIBE

No. 82–331.   Argued April 19, 1983—Decided June 13, 1983

MARSHALL, J., delivered the opinion for a unanimous Court.

*Thomas L. Dunigan,* Special Assistant Attorney General of New Mexico, argued the cause for petitioners.   With him on the briefs were *Paul Bardacke,* Attorney General, and *Paul A. Lenzini.*

*George E. Fettinger* argued the cause for respondent. With him on the brief were *Kathleen A. Miller* and *Kim Jerome Gottschalk.*

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins,* and *Jacques B. Gelin.**

JUSTICE MARSHALL delivered the opinion of the Court.

We are called upon to decide in this case whether a State may restrict an Indian Tribe's regulation of hunting and fishing on its reservation. With extensive federal assistance and supervision, the Mescalero Apache Tribe has established a comprehensive scheme for managing the reservation's fish and wildlife resources. Federally approved tribal ordinances regulate in detail the conditions under which both members of the Tribe and nonmembers may hunt and fish. New Mexico seeks to apply its own laws to hunting and fishing by nonmembers on the reservation. We hold that this application of New Mexico's hunting and fishing laws is pre-empted by the operation of federal law.

## I

The Mescalero Apache Tribe (Tribe) resides on a reservation located within Otero County in south central New Mexico. The reservation, which represents only a small portion

---

*Briefs of *amici curiae* urging reversal were filed by *Robert K. Corbin,* Attorney General of Arizona, *Steven J. Silver,* Special Assistant Attorney General, *Kenneth L. Eikenberry,* Attorney General of Washington, and *James R. Johnson,* Senior Assistant Attorney General, for the State of Arizona et al.; and by *David L. Wilkinson,* Attorney General, *Richard L. Dewsnup,* Solicitor General, and *Dallin W. Jensen* and *Michael M. Quealy,* Assistant Attorneys General, for the State of Utah.

Briefs of *amici curiae* urging affirmance were filed by *Frank E. Maynes* for the Southern Ute Indian Tribe; by *Martin E. Seneca, Jr.,* for the Uintah and Ouray Tribe; and by *Robert C. Brauchli* for the White Mountain Apache Tribe.

of the aboriginal Mescalero domain, was created by a succession of Executive Orders promulgated in the 1870's and 1880's.[1] The present reservation comprises more than 460,000 acres, of which the Tribe owns all but 193.85 acres.[2] Approximately 2,000 members of the Tribe reside on the reservation, along with 179 non-Indians, including resident federal employees of the Bureau of Indian Affairs and the Indian Health Service.

The Tribe is organized under the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* (1976 ed. and Supp. V), which authorizes any tribe residing on a reservation to adopt a constitution and bylaws, subject to the approval of the Secretary of the Interior (Secretary). The Tribe's Constitution, which was approved by the Secretary on January 12, 1965, requires the Tribal Council

> "[t]o protect and preserve the property, wildlife and natural resources of the tribe, and to regulate the conduct of trade and the use and disposition of tribal property upon the reservation, providing that any ordinance directly affecting non-members of the tribe shall be subject to review by the Secretary of [the] Interior." App. 53a.

---

[1] See 1 C. Kappler, Indian Affairs Laws and Treaties 870–873 (1904). The final boundaries were fixed by the Executive Order of Mar. 24, 1883 (Order of President Arthur). Portions of the reservation were briefly included in a National Forest, but were restored to the Mescalero Reservation by the Executive Order of Feb. 17, 1912 (Order of President Taft). An intervening Executive Order of Mar. 1, 1910, issued by President Taft exempted from the reservation two "small holdings claims" covering settlements located before the establishment of the reservation. The Tribe has since purchased all but 23.8 acres of the land covered by these claims.

[2] These lands comprise the 23.8 acres remaining of the "small holdings claims," see n. 1, *supra;* 10 acres granted to St. Joseph's Catholic Church by the Act of Mar. 29, 1928, ch. 299, 45 Stat. 1716; and the unimproved and unoccupied 160-acre "Dodson Tract" in the northwest portion of the reservation. See Brief for United States as *Amicus Curiae* 2, n. 3.

The Constitution further provides that the Council shall

"adopt and approve plans of operation to govern the conduct of any business or industry that will further the economic well-being of the members of the tribe, and to undertake any activity of any nature whatsoever, not inconsistent with Federal law or with this constitution, designed for the social or economic improvement of the Mescalero Apache people, . . . subject to review by the Secretary of the Interior." *Ibid.*

Anticipating a decline in the sale of lumber which has been the largest income-producing activity within the reservation, the Tribe has recently committed substantial time and resources to the development of other sources of income. The Tribe has constructed a resort complex financed principally by federal funds,[3] and has undertaken a substantial development of the reservation's hunting and fishing resources. These efforts provide employment opportunities for members of the Tribe, and the sale of hunting and fishing licenses and related services generates income which is used to maintain the tribal government and provide services to Tribe members.[4]

Development of the reservation's fish and wildlife resources has involved a sustained, cooperative effort by the

---

[3] Financing for the complex, the Inn of the Mountain Gods, came principally from the Economic Development Administration (EDA), an agency of the United States Department of Commerce, and other federal sources. In addition, the Tribe obtained a $6 million loan from the Bank of New Mexico, 90% of which was guaranteed by the Secretary of the Interior under the Indian Financing Act of 1974, 25 U. S. C. § 1451 *et seq.* (1976 ed. and Supp. V), and 10% of which was guaranteed by tribal funds. Certain additional facilities at the Inn were completely funded by the EDA as public works projects, and other facilities received 50% funding from the EDA. App. to Brief in Opposition 7a–8a.

[4] Income from the sale of hunting and fishing licenses, "package hunts" which combine hunting and fishing with use of the facilities at the Inn, and campground and picnicking permits totaled $269,140 in 1976 and $271,520 in 1977. The vast majority of the nonmember hunters and fishermen on the reservation are not residents of the State of New Mexico.

Tribe and the Federal Government. Indeed, the reservation's fishing resources are wholly attributable to these recent efforts. Using federal funds, the Tribe has established eight artificial lakes which, together with the reservation's streams, are stocked by the Bureau of Sport Fisheries and Wildlife of the United States Fish and Wildlife Service, Department of the Interior, which operates a federal hatchery located on the reservation. None of the waters are stocked by the State.[5] The United States has also contributed substantially to the creation of the reservation's game resources. Prior to 1966 there were only 13 elk in the vicinity of the reservation. In 1966 and 1967 the National Park Service donated a herd of 162 elk which was released on the reservation. Through its management and range development[6] the Tribe has dramatically increased the elk population, which by 1977 numbered approximately 1,200. New Mexico has not contributed significantly to the development of the elk herd or the other game on the reservation, which includes antelope, bear, and deer.[7]

The Tribe and the Federal Government jointly conduct a comprehensive fish and game management program. Pursuant to its Constitution and to an agreement with the Bureau of Sport Fisheries and Wildlife,[8] the Tribal Council adopts hunting and fishing ordinances each year. The tribal ordinances, which establish bag limits and seasons and pro-

---

[5] The State has not stocked any waters on the reservation since 1976.

[6] These efforts have included controlling and reducing the population of other animals, such as wild horses and cattle, which compete for the available forage on the reservation.

[7] The New Mexico Department of Game and Fish issued a permit for the importation of the elk from Wyoming into New Mexico. The Department has provided the Tribe with any management assistance which the Tribe has requested; such requests have been limited. *Id.*, at 16a.

[8] That agreement, which provides for the stocking of the reservation's artificial lakes by the Bureau, obligates the Tribe to "designate those waters of the Reservation which shall be open to public fishing" and to "establish regulations for the conservation of the fishery resources." App. 71a.

vide for licensing of hunting and fishing, are subject to approval by the Secretary under the Tribal Constitution and have been so approved. The Tribal Council adopts the game ordinances on the basis of recommendations submitted by a Bureau of Indian Affairs' range conservationist who is assisted by full-time conservation officers employed by the Tribe. The recommendations are made in light of the conservation needs of the reservation, which are determined on the basis of annual game counts and surveys. Through the Bureau of Sport Fisheries and Wildlife, the Secretary also determines the stocking of the reservation's waters based upon periodic surveys of the reservation.

Numerous conflicts exist between state and tribal hunting regulations.[9] For instance, tribal seasons and bag limits for both hunting and fishing often do not coincide with those imposed by the State. The Tribe permits a hunter to kill both a buck and a doe; the State permits only buck to be killed. Unlike the State, the Tribe permits a person to purchase an elk license in two consecutive years. Moreover, since 1977, the Tribe's ordinances have specified that state hunting and fishing licenses are not required for Indians or non-Indians who hunt or fish on the reservation.[10] The New Mexico Department of Game and Fish has enforced the State's regulations by arresting non-Indian hunters for illegal possession of game killed on the reservation in accordance with tribal ordinances but not in accordance with state hunting regulations.

In 1977 the Tribe filed suit against the State and the Director of its Game and Fish Department in the United States District Court for the District of New Mexico, seeking to prevent the State from regulating on-reservation hunting or

---

[9] These conflicts have persisted despite the parties' stipulation that the New Mexico State Game Commission has attempted to "accommodate the preferences of the Mescalero Apache Tribe and other Indian tribes." App. to Brief in Opposition 25a.

[10] Prior to 1977 the Tribe consented to the application to the reservation of the State's hunting and fishing regulations.

fishing by members or nonmembers.  On August 2, 1978, the District Court ruled in favor of the Tribe and granted declaratory and injunctive relief against the enforcement of the State's hunting and fishing laws against any person for hunting and fishing activities conducted on the reservation.  The United States Court of Appeals for the Tenth Circuit affirmed.   630 F. 2d 724 (1980).   Following New Mexico's petition for a writ of certiorari, this Court vacated the Tenth Circuit's judgment, 450 U. S. 1036 (1981), and remanded the case for reconsideration in light of *Montana* v. *United States*, 450 U. S. 544 (1981).   On remand, the Court of Appeals adhered to its earlier decision.   677 F. 2d 55 (1982).   We granted certiorari, 459 U. S. 1014 (1982), and we now affirm.

## II

New Mexico concedes that on the reservation the Tribe exercises exclusive jurisdiction over hunting and fishing by members of the Tribe and may also regulate the hunting and fishing by nonmembers.[11]   New Mexico contends, however, that it may exercise concurrent jurisdiction over nonmembers and that therefore its regulations governing hunting and fishing throughout the State should also apply to hunting and fishing by nonmembers on the reservation.   Although New Mexico does not claim that it can require the Tribe to permit nonmembers to hunt and fish on the reservation, it claims that, once the Tribe chooses to permit hunting and fishing by nonmembers, such hunting and fishing is subject to any state-imposed conditions.   Under this view the State would be free to impose conditions more restrictive than the Tribe's own regulations, including an outright prohibition.   The question in this case is whether the State may so restrict the Tribe's exercise of its authority.

Our decision in *Montana* v. *United States*, *supra*, does not resolve this question.   Unlike this case, *Montana* concerned lands located within the reservation but *not* owned by the

---

[11] Brief for Petitioners 7, 12, 20; Tr. of Oral Arg. 7.

Tribe or its members.   We held that the Crow Tribe could not as a general matter regulate hunting and fishing on those lands.   450 U. S., at 557–567.[12]   But as to "land belonging to the Tribe or held by the United States in trust for the Tribe," we "readily agree[d]" that a Tribe may "prohibit nonmembers from hunting or fishing . . . [or] condition their entry by charging a fee or establish bag and creel limits."   Id., at 557. We had no occasion to decide whether a Tribe may only exercise this authority in a manner permitted by a State.

On numerous occasions this Court has considered the question whether a State may assert authority over a reservation. The decision in Worcester v. Georgia, 6 Pet. 515, 560 (1832), reflected the view that Indian tribes were wholly distinct nations within whose boundaries "the laws of [a State] can have no force."   We long ago departed from the "conceptual clarity of Mr. Chief Justice Marshall's view in Worcester," Mescalero Apache Tribe v. Jones, 411 U. S. 145, 148 (1973), and have acknowledged certain limitations on tribal sovereignty. For instance, we have held that Indian tribes have been implicitly divested of their sovereignty in certain respects by virtue of their dependent status,[13] that under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation,[14] and that in exceptional

---

[12] Even so, the Court acknowledged that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands."   450 U. S., at 565.   The Court stressed that in Montana the pleadings "did not allege that non-Indian hunting and fishing on [non-Indian] reservation lands [had] impaired [the Tribe's reserved hunting and fishing privileges]," id., at 558, n. 6, or "that non-Indian hunting and fishing on fee lands imperil the subsistence or welfare of the Tribe," id., at 566, and that the existing record failed to suggested "that such non-Indian hunting and fishing . . . threaten the Tribe's political or economic security."   Ibid.

[13] See, e. g., Oneida Indian Nation v. County of Oneida, 414 U. S. 661, 667–668 (1974); Oliphant v. Suquamish Indian Tribe, 435 U. S. 191 (1978).

[14] See, e. g., Washington v. Confederated Tribes of Colville Indian Reservation, 447 U. S. 134 (1980); Moe v. Salish & Kootenai Tribes, 425 U. S. 463 (1976).

circumstances a State may assert jurisdiction over the on-reservation activities of tribal members.[15]

Nevertheless, in demarcating the respective spheres of state and tribal authority over Indian reservations, we have continued to stress that Indian tribes are unique aggregations possessing "'attributes of sovereignty over both their members and their territory,'" *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142 (1980), quoting *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975). Because of their sovereign status, tribes and their reservation lands are insulated in some respects by a "historic immunity from state and local control," *Mescalero Apache Tribe* v. *Jones, supra,* at 152, and tribes retain any aspect of their historical sovereignty not "inconsistent with the overriding interests of the National Government." *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 153 (1980).

The sovereignty retained by tribes includes "the power of regulating their internal and social relations," *United States* v. *Kagama,* 118 U. S. 375, 381–382 (1886), cited in *United States* v. *Wheeler,* 435 U. S. 313, 322 (1978). A tribe's power to prescribe the conduct of tribal members has never been doubted, and our cases establish that "'absent governing Acts of Congress,'" a State may not act in a manner that "'infringe[s] on the right of reservation Indians to make their own laws and be ruled by them.'" *McClanahan* v. *Arizona*

---

[15] See *Puyallup Tribe* v. *Washington Game Dept.,* 433 U. S. 165 (1977). *Puyallup* upheld the State of Washington's authority to regulate on-reservation fishing by tribal members. Like *Montana* v. *United States,* the decision in *Puyallup* rested in part on the fact that the dispute centered on lands which, although located within the reservation boundaries, no longer belonged to the Tribe; all but 22 of the 18,000 acres had been alienated in fee simple. The Court also relied on a provision of the Indian treaty which qualified the Indians' fishing rights by requiring that they be exercised "in common with all citizens of the Territory," 433 U. S., at 175, and on the State's interest in conserving a scarce, common resource. *Id.,* at 174, 175–177.

*State Tax Comm'n*, 411 U. S. 164, 171–172 (1973), quoting *Williams* v. *Lee*, 358 U. S. 217, 219–220 (1959). See also *Fisher* v. *District Court*, 424 U. S. 382, 388–389 (1976) *(per curiam)*.

A tribe's power to exclude nonmembers entirely or to condition their presence on the reservation is equally well established. See, *e. g.*, *Montana* v. *United States*, 450 U. S. 544 (1981); *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982). Whether a State may also assert its authority over the on-reservation activities of nonmembers raises "[m]ore difficult questions," *Bracker, supra,* at 144. While under some circumstances a State may exercise concurrent jurisdiction over non-Indians acting on tribal reservations, see, *e. g.*, *Washington* v. *Confederated Tribes, supra; Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), such authority may be asserted only if not pre-empted by the operation of federal law. See, *e. g.*, *Ramah Navajo School Bd., Inc.* v. *Bureau of Revenue of New Mexico*, 458 U. S. 832 (1982); *Bracker, supra; Central Machinery Co.* v. *Arizona Tax Comm'n*, 448 U. S. 160 (1980); *Williams* v. *Lee, supra; Warren Trading Post* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965); *Fisher* v. *District Court, supra; Kennerly* v. *District Court of Montana*, 400 U. S. 423 (1971).

In *Bracker* we reviewed our prior decisions concerning tribal and state authority over Indian reservations and extracted certain principles governing the determination whether federal law pre-empts the assertion of state authority over nonmembers on a reservation. We stated that that determination does not depend "on mechanical or absolute conceptions of state or tribal sovereignty, but call[s] for a particularized inquiry into the nature of the state, federal, and tribal interests at stake." 448 U. S., at 145.

We also emphasized the special sense in which the doctrine of pre-emption is applied in this context. See *id.*, at 143–144; *Ramah Navajo School Bd., supra,* at 838. Although a State will certainly be without jurisdiction if its authority

is pre-empted under familiar principles of pre-emption, we cautioned that our prior cases did not limit pre-emption of state laws affecting Indian tribes to only those circumstances. "The unique historical origins of tribal sovereignty" and the federal commitment to tribal self-sufficiency and self-determination make it "treacherous to import . . . notions of pre-emption that are properly applied to . . . other [contexts]." *Bracker, supra,* at 143. See also *Ramah Navajo School Bd., supra,* at 838. By resting pre-emption analysis principally on a consideration of the nature of the competing interests at stake, our cases have rejected a narrow focus on congressional intent to pre-empt state law as the sole touchstone. They have also rejected the proposition that pre-emption requires " 'an express congressional statement to that effect.' " *Bracker, supra,* at 144 (footnote omitted). State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority. *Bracker, supra,* at 145. See also *Ramah Navajo School Bd., supra,* at 845, quoting *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941).[16]

Certain broad considerations guide our assessment of the federal and tribal interests. The traditional notions of Indian sovereignty provide a crucial "backdrop," *Bracker, supra,* at 143, citing *McClanahan, supra,* at 172, against which any assertion of state authority must be assessed. Moreover, both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-govern-

---

[16] The exercise of state authority may also be barred by an independent barrier—inherent tribal sovereignty—if it "unlawfully infringe[s] 'on the right of reservation Indians to make their own laws and be ruled by them.' " *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136, 142 (1980), quoting *Williams* v. *Lee,* 358 U. S. 217, 220 (1959). "See also *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 502 (1979); *Fisher* v. *District Court,* 424 U. S. 382 (1976) *(per curiam); Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971)." 448 U. S., at 142–143.

ment, a goal embodied in numerous federal statutes.[17]   We have stressed that Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging "tribal self-sufficiency and economic development." *Bracker*, 448 U. S., at 143 (footnote omitted).   In part as a necessary implication of this broad federal commitment, we have held that tribes have the power to manage the use of their territory and resources by both members and nonmembers,[18] *Merrion, supra*, at 137; *Bracker, supra*, at 151; *Montana* v. *United States, supra;* 18 U. S. C. § 1162(b); 25 U. S. C. §§ 1321(b), 1322(b), to undertake and regulate economic activity within the reservation, *Merrion*, 455 U. S., at 137, and to defray

---

[17] For example, the Indian Financing Act of 1974, 25 U. S. C. § 1451 *et seq.* (1976 ed. and Supp. V), states: "It is hereby declared to be the policy of Congress . . . to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own productive efforts comparable to that enjoyed by non-Indians in neighboring communities." § 1451. Similar policies underlie the Indian Self-Determination and Education Assistance Act of 1975, 25 U. S. C. § 450 *et seq.*, as well as the Indian Reorganization Act of 1934, 25 U. S. C. § 461 *et seq.* (1976 ed. and Supp. V), pursuant to which the Mescalero Apache Tribe adopted its Constitution.   The "intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism.'" *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 152 (1973), quoting H. R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934).   The Indian Civil Rights Act of 1968, 25 U. S. C. § 1301 *et seq.*, likewise reflects Congress' intent "to promote the well-established federal 'policy of furthering Indian self-government.'" *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 62 (1978), quoting *Morton* v. *Mancari*, 417 U. S. 535, 551 (1974).

[18] Our cases have recognized that tribal sovereignty contains a "significant geographical component." *Bracker, supra,* at 151.   Thus the off-reservation activities of Indians are generally subject to the prescriptions of a "nondiscriminatory state law" in the absence of "express federal law to the contrary." *Mescalero Apache Tribe* v. *Jones, supra,* at 148–149.

the cost of governmental services by levying taxes. *Ibid.* Thus, when a tribe undertakes an enterprise under the authority of federal law, an assertion of state authority must be viewed against any interference with the successful accomplishment of the federal purpose. See generally *Bracker, supra,* at 143 (footnote omitted); *Ramah Navajo School Bd.,* 458 U. S., at 845, quoting *Hines* v. *Davidowitz, supra,* at 67 (state authority precluded when it "'stands as an obstacle to the accomplishment of the full purposes and objectives of Congress'").

Our prior decisions also guide our assessment of the state interest asserted to justify state jurisdiction over a reservation. The exercise of state authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity. *Ramah Navajo School Bd., supra,* at 843, and n. 7; *Bracker, supra,* at 148–149; *Central Machinery Co.* v. *Arizona Tax Comm'n,* 448 U. S., at 174 (POWELL, J., dissenting). Thus a State seeking to impose a tax on a transaction between a tribe and nonmembers must point to more than its general interest in raising revenues. See, *e. g., Warren Trading Post Co.* v. *Arizona,* 380 U. S. 685 (1965); *Bracker, supra; Ramah Navajo School Bd., supra.* See also *Confederated Tribes,* 447 U. S., at 157 ("governmental interest in raising revenues is . . . strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services"); *Moe,* 425 U. S., at 481–483 (State may require tribal shops to collect state cigarette tax from nonmember purchasers). A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention. Cf. *Puyallup Tribe* v. *Washington Game Dept.,* 433 U. S. 165 (1977).

## III

With these principles in mind, we turn to New Mexico's claim that it may superimpose its own hunting and fishing

regulations on the Mescalero Apache Tribe's regulatory scheme.

## A

It is beyond doubt that the Mescalero Apache Tribe lawfully exercises substantial control over the lands and resources of its reservation, including its wildlife. As noted *supra*, at 330, and as conceded by New Mexico,[19] the sovereignty retained by the Tribe under the Treaty of 1852 includes its right to regulate the use of its resources by members as well as nonmembers. In *Montana* v. *United States*, we specifically recognized that tribes in general retain this authority.

Moreover, this aspect of tribal sovereignty has been expressly confirmed by numerous federal statutes.[20] Pub. L. 280 specifically confirms the power of tribes to regulate on-reservation hunting and fishing. 67 Stat. 588, 18 U. S. C. § 1162(b); see also 25 U. S. C. § 1321(b).[21] This authority

---

[19] New Mexico concedes that the Tribe originally relied on wildlife for subsistence, that tribal members freely took fish and game in ancestral territory, and that the Treaty of July 1, 1852, 10 Stat. 979, between the Tribe and the United States confirmed the Tribe's rights regarding hunting and fishing on the small portion of the aboriginal Mescalero domain that was eventually set apart as the Tribe's reservation. Brief for Petitioners 12. See *Menominee Tribe* v. *United States*, 391 U. S. 404 (1968); *Montana* v. *United States*, 450 U. S. 544, 558–559 (1981). See also *United States* v. *Winans*, 198 U. S. 371, 381 (1905) (recognizing that hunting and fishing "were not much less necessary to the existence of the Indians than the atmosphere they breathed").

[20] The Tribe's authority was also confirmed more generally by the Indian Reorganization Act of 1934, 25 U. S. C. § 476, which reaffirms "all powers vested in any Indian tribe or tribal council by existing law."

[21] The provision of Pub. L. 280 granting States criminal jurisdiction over Indian reservations under certain conditions provides that States are not thereby authorized to

"deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing *or the control, licensing or regulation thereof.*" 18 U. S. C. § 1162(b) (emphasis added). The same language is contained in 25 U. S. C. § 1321(b).

is afforded the protection of the federal criminal law by 18 U. S. C. § 1165, which makes it a violation of federal law to enter Indian land to hunt, trap, or fish without the consent of the tribe.   See *Montana* v. *United States*, 450 U. S., at 562, n. 11.   The 1981 Amendments to the Lacey Act, 16 U. S. C. § 3371 *et seq.* (1976 ed., Supp. V), further accord tribal hunting and fishing regulations the force of federal law by making it a federal offense "to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife . . . taken or possessed in violation of any . . . Indian tribal law." § 3372(a)(1).[22]

## B

Several considerations strongly support the Court of Appeals' conclusion that the Tribe's authority to regulate hunting and fishing pre-empts state jurisdiction.   It is important to emphasize that concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation.   Concurrent jurisdiction would empower New Mexico wholly to supplant tribal regulations.   The State would be able to dictate the terms on which nonmembers are permitted to utilize the reservation's resources.   The Tribe would thus exercise its authority over the reservation only at the sufferance of the State.   The tribal authority to regulate hunting and fishing by nonmembers, which has been repeatedly confirmed by federal treaties and laws and which we explicitly recognized in *Montana* v. *United States, supra,* would have a rather hollow ring if tribal authority amounted to no more than this.

Furthermore, the exercise of concurrent state jurisdiction in this case would completely "disturb and disarrange," *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra,* at 691, the comprehensive scheme of federal and tribal management established pursuant to federal law.   As described

---

[22] Sections 3375(a) and (b) authorize the Secretary to enter into agreements with Indian tribes to enforce the provisions of the law by, *inter alia*, making arrests and serving process.

*supra*, at 326, federal law requires the Secretary to review each of the Tribe's hunting and fishing ordinances. Those ordinances are based on the recommendations made by a federal range conservationist employed by the Bureau of Indian Affairs. Moreover, the Bureau of Sport Fisheries and Wildlife stocks the reservation's waters based on its own determinations concerning the availability of fish, biological requirements, and the fishing pressure created by on-reservation fishing. App. 71a.[23]

Concurrent state jurisdiction would supplant this regulatory scheme with an inconsistent dual system: members would be governed by tribal ordinances, while nonmembers would be regulated by general state hunting and fishing laws. This could severely hinder the ability of the Tribe to conduct a sound management program. Tribal ordinances reflect the specific needs of the reservation by establishing the optimal level of hunting and fishing that should occur, not simply a maximum level that should not be exceeded. State laws in contrast are based on considerations not necessarily relevant to, and possibly hostile to, the needs of the reservation. For instance, the ordinance permitting a hunter to kill a buck and a doe was designed to curb excessive growth of the deer population on the reservation. *Id.*, at 153a–154a. Enforcement of the state regulation permitting only buck to be killed would frustrate that objective. Similarly, by determining the tribal hunting seasons, bag limits, and permit availability, the Tribe regulates the duration and intensity of hunting. These determinations take into account numerous factors, including the game capacity of the terrain, the range utilization of the game animals, and the availability of tribal personnel to monitor the hunts. Permitting the State to enforce different restrictions simply because they have been determined to be appropriate for the State as a whole would impose on the Tribe the possibly insurmountable task of ensuring that the

---

[23] In addition, as noted earlier, *supra*, at 327–328, the Federal Government played a substantial role in the development of the Tribe's resources.

patchwork application of state and tribal regulations remains consistent with sound management of the reservation's resources.

Federal law commits to the Secretary and the Tribal Council the responsibility to manage the reservation's resources. It is most unlikely that Congress would have authorized, and the Secretary would have established, financed, and participated in, tribal management if it were thought that New Mexico was free to nullify the entire arrangement.[24] Requiring tribal ordinances to yield whenever state law is more restrictive would seriously "undermine the Secretary's [and the Tribe's] ability to make the wide range of determinations committed to [their] authority." *Bracker*, 448 U. S., at 149. See *Fisher* v. *District Court*, 424 U. S., at 390; *United States* v. *Mazurie*, 419 U. S. 544 (1975).[25]

---

[24] The Secretary assumed precisely the opposite is true—that state jurisdiction is pre-empted—when he approved a tribal ordinance which provided that nonmembers hunting and fishing on the reservation need not obtain state licenses. That assumption is also embodied in an agreement between the Tribe and the Department of the Interior's Bureau of Sport Fisheries and Wildlife, see n. 8, *supra*, which openly acknowledges that tribal regulations need not agree with state laws. The agreement provides that *"[i]nsofar as possible* said regulations shall be in agreement with State regulations." App. 71a. (Emphasis added.)

[25] Congress' intent to pre-empt state regulation of hunting and fishing on reservations is reinforced by Pub. L. 280. That law, which grants limited criminal and civil jurisdiction over Indian reservations to States which meet certain requirements, contains a provision which expressly excludes authority over hunting and fishing. See n. 21, *supra*. Pub. L. 280 evidences Congress' understanding that tribal regulation of hunting and fishing should generally be insulated from state interference, since "Congress would not have jealously protected" tribal exemption from conflicting state hunting and fishing laws "had it thought that the States had residual power to impose such [laws] in any event." *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 177 (1973). In *McClanahan* we concluded that the Buck Act, 4 U. S. C. § 105 *et seq.*, which contains a provision exempting Indians from a grant to the States of general authority to tax residents of federal areas, likewise provided evidence of Congress' intent to exempt Indians from state taxes. *Ibid.*

The assertion of concurrent jurisdiction by New Mexico not only would threaten to disrupt the federal and tribal regulatory scheme, but also would threaten Congress' overriding objective of encouraging tribal self-government and economic development. The Tribe has engaged in a concerted and sustained undertaking to develop and manage the reservation's wildlife and land resources specifically for the benefit of its members. The project generates funds for essential tribal services and provides employment for members who reside on the reservation. This case is thus far removed from those situations, such as on-reservation sales outlets which market to nonmembers goods not manufactured by the tribe or its members, in which the tribal contribution to an enterprise is *de minimis*. See *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S., at 154–159.[26] The tribal enterprise in this case clearly involves "value generated on the reservation by activities involving the Trib[e]." *Id.*, at 156–157. The disruptive effect that would result from the assertion of concurrent jurisdiction by New Mexico would plainly "'stan[d] as an obstacle to the accomplishment of the full purposes and objectives of Congress,'" *Ramah Navajo School Bd.*, 458 U. S., at 845, quoting *Hines* v. *Davidowitz*, 312 U. S., at 67.

## C

The State has failed to "identify any regulatory function or service . . . that would justify" the assertion of concurrent regulatory authority. *Bracker, supra*, at 148. The hunting and fishing permitted by the Tribe occur entirely on the res-

---

[26] In *Washington* v. *Confederated Tribes* the Court held that the sales of tribal smokeshops which sold cigarettes to nonmembers were subject to the state sales and cigarette taxes. 447 U. S., at 154–159. The Court relied on the fact that the tribal smokeshops were not marketing "value generated on the reservation," *id.*, at 156–157, but instead were seeking merely to market a "tax exemption to nonmembers who do not receive significant tribal services." *Id.*, at 157.

ervation. The fish and wildlife resources are either native to the reservation or were created by the joint efforts of the Tribe and the Federal Government. New Mexico does not contribute in any significant respect to the maintenance of these resources, and can point to no other "governmental functions it provides," *Ramah Navajo School Bd., supra,* at 843, in connection with hunting and fishing on the reservation by nonmembers that would justify the assertion of its authority.

The State also cannot point to any off-reservation effects that warrant state intervention. Some species of game never leave tribal lands, and the State points to no specific interest concerning those that occasionally do. Unlike *Puyallup Tribe v. Washington Game Dept.,* this is not a case in which a treaty expressly subjects a tribe's hunting and fishing rights to the common rights of nonmembers and in which a State's interest in conserving a scarce, common supply justifies state intervention. 433 U. S., at 174, 175–177. The State concedes that the Tribe's management has "not had an adverse impact on fish and wildlife outside the Reservation." App. to Brief in Opposition 35a.[27]

We recognize that New Mexico may be deprived of the sale of state licenses to nonmembers who hunt and fish on the reservation, as well as some federal matching funds calculated in

---

[27] We reject the State's claim that the Tribe's ability to manage its wildlife resources suffers from a lack of enforcement powers and that therefore concurrent jurisdiction is necessary to fill the void. The Tribe clearly can exclude or expel those who violate tribal ordinances. Trespassers may be referred for prosecution under 18 U. S. C. § 1165. Furthermore, the Lacey Act Amendments of 1981, 16 U. S. C. § 3371 *et seq.* (1976 ed., Supp. V), make it a federal offense to violate any tribal law, provide for civil and criminal penalties and authorize forfeiture of fish or wildlife as well as vehicles or equipment used in the violation, §§ 3373, 3374, and provide that the Secretary can grant authority to tribal personnel to enforce these provisions. §§ 3375(a), (b).

part on the basis of the number of state licenses sold.[28]   However, any financial interest the State might have in this case is simply insufficient to justify the assertion of concurrent jurisdiction.   The loss of revenues to the State is likely to be insubstantial given the small numbers of persons who purchase tribal hunting licenses.[29]   Moreover, unlike *Confederated Tribes, supra,* and *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), the activity involved here concerns value generated on the reservation by the Tribe.   Finally, as already noted *supra,* at 342, the State has pointed to no services it has performed in connection with hunting and fishing by nonmembers which justify imposing a tax in the form of a hunting and fishing license, *Ramah Navajo School Bd., supra,* at 843; *Central Machinery Co.* v. *Arizona Tax Comm'n,* 448 U. S., at 174 (POWELL, J., dissenting), and its general desire to obtain revenues is simply inadequate to justify the assertion of concurrent jurisdiction in this case. See *Bracker,* 448 U. S., at 150; *Ramah Navajo School Bd., supra,* at 845.[30]

## IV

In this case the governing body of an Indian Tribe, working closely with the Federal Government and under the authority of federal law, has exercised its lawful authority to develop and manage the reservation's resources for the benefit of its members.   The exercise of concurrent jurisdiction

---

[28] The State receives federal matching funds through the Pittman-Robertson Act, 16 U. S. C. § 669 (hunting), and the Dingell-Johnson Act, 16 U. S. C. § 777 (fishing), which are allocated through a formula which considers the number of licenses sold and the number of acres in the State.

[29] In recent years the Tribe sold 10 antelope licenses compared to 3,500 for the State, 50 elk licenses compared to 14,000 by the State, and 500 deer licenses compared to 100,000 for the State.

[30] New Mexico concedes that it has expended no Dingell-Johnson funds for projects within the reservation during the last six to eight years.   App. to Brief in Opposition 17a–18a.   It presented no evidence as to expenditures of Pittman-Robertson funds within the reservation.

by the State would effectively nullify the Tribe's unquestioned authority to regulate the use of its resources by members and nonmembers, interfere with the comprehensive tribal regulatory scheme, and threaten Congress' firm commitment to the encouragement of tribal self-sufficiency and economic development. Given the strong interests favoring exclusive tribal jurisdiction and the absence of state interests which justify the assertion of concurrent authority, we conclude that the application of the State's hunting and fishing laws to the reservation is pre-empted.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*