OSCN Found Document:Questions Submitted by The Honorable Chris Kannady, Oklahoma House of Representatives, District 91

 

 
 Questions Submitted by The Honorable Chris Kannady, Oklahoma House of Representatives, District 91
2025 OK AG 19
Decided: 12/18/2025
OKLAHOMA ATTORNEY GENERAL OPINIONS
Cite as: 2025 OK AG 19, __ P.3d __

 
¶0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following questions:

1. Does federal law preempt application of the Oklahoma Wildlife Code, title 29 of the Oklahoma statutes, to Indians hunting and fishing on the Cherokee, Chickasaw, or Choctaw Nations' reservations? [1] 

2. Does Stroble v. Oklahoma Tax Commission, and/or City of Tulsa v. O'Brien, authorize enforcing the Wildlife Code against Indians hunting or fishing on the Nations' reservations?

¶1 A note on timing: This office is aware of pending litigation, Cherokee Nation v. Free, No. 4:25-cv-00630-CVE-JFJ (N.D. Okla. Nov. 18, 2025), concerning the issues addressed herein. While this office typically declines to issue opinions when related litigation is pending, the circumstances here warrant an exception. First, the applicable legal framework under New Mexico v. Mescalero Apache Tribe, 462 U.S. 324 (1983), is well-established. Second, hunting season is currently underway. Tribal citizens should not be deprived of their long-held rights while litigation proceeds and Oklahoma and tribal wildlife departments need clear guidance on these issues as a matter of law. Third, providing guidance now reduces the State's potential liability exposure. A factual record developed by a court is unlikely to compel a different conclusion on the legal questions presented.

 ¶2 As used in this Opinion, the following definitions apply:

"Indians" is as defined in 25 U.S.C. § 1301(4), i.e., "any person who would be subject to the jurisdiction of the United States as an Indian under [18 U.S.C. § 1153] if that person were to commit an offense listed in that section in Indian country to which that section applies."
"Member Indian" refers to an Indian hunting or fishing on the reservation of the Nation in which that person is enrolled.
"Five Tribe Nonmember Indian" refers to an Indian enrolled in one of the Five Tribes (Cherokee, Chickasaw, Choctaw, Muscogee (Creek), or Seminole Nations) who hunts or fishes on the reservation of another Five Tribes pursuant to the Five Tribes Wildlife Management Reciprocity Agreement--for example, a Choctaw citizen hunting on Cherokee land under the Five Tribes Wildlife Management Reciprocity Agreement.

I.
SUMMARY

¶3 The supremacy of federal law dictates that it preempts application of the Oklahoma Wildlife Conservation Code, title 29 of the Oklahoma statutes (the "Wildlife Code"), to Member Indians and Five Tribe Nonmember Indians hunting and fishing on the Nations' reservations. Under White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980), and Mescalero, 462 U.S. 324, the Wildlife Code does not apply to Member Indians or to Five Tribe Nonmember Indians hunting on the Nations' reservations. [2]

¶4 In response to your specific questions:

First, federal law bars application of the Wildlife Code to Member Indians and Five Tribe Nonmember Indians hunting and fishing on the three Nations' reservations. Under Mescalero, state wildlife regulation is preempted where tribes have developed comprehensive wildlife management programs. The Nations have enacted comprehensive wildlife codes that establish licensing requirements, seasons, bag limits, and enforcement mechanisms. [3] The Nations' licensing departments are charged with enforcing the codes by issuing or revoking licenses, tracking harvest data, and providing education. Federal law further reinforces tribal authority through statutes recognizing the inherent power of Indian tribes to exercise jurisdiction over all Indians within their territories. 25 U.S.C. § 1301(2).
Second, neither Stroble v. Oklahoma Tax Commission, 2025 OK 48City of Tulsa v. O'Brien, 2024 OK CR 31Stroble addresses only state civil tax jurisdiction and makes no real effort to analyze the federal preemption principles that govern whether state law applies here. And under O'Brien's required Bracker balancing test, tribal and federal interests heavily outweigh any state interest, prohibiting Wildlife Code enforcement against Indians on reservations. Finally, seminal Supreme Court cases addressing the powers of tribes and states to regulate hunting have never suggested that the state has authority to regulate hunting and fishing by Indians on their own reservations. Indeed, New Mexico acknowledged in Mescalero that it did not have jurisdiction over Indians hunting or fishing on their own reservations. See Mescalero, 462 U.S. at 330. As to Member Indians, no Bracker balancing is required: it is clear that the state does not have authority to enforce the Wildlife Code on a Member Indian who seeks to harvest game on the land the federal government promised to his or her tribe.

II. 
BACKGROUND

¶5 The United States has a special trust relationship with Indian Tribes, under which the federal government is obligated to protect and assure tribal sovereignty and self-government, and to protect tribal lands, culture, and well-being. See Seminole Nation v. United States, 316 U.S. 286, 296--97 (1942); 25 U.S.C. § 3601. The United States established reservations for the Choctaw, Chickasaw, and Cherokee Nations through a series of treaties negotiated during the nineteenth century. [4] In McGirt v. Oklahoma, 591 U.S. 894 (2020), and subsequent decisions, the Supreme Court and the Oklahoma Court of Criminal Appeals confirmed that Congress never disestablished these reservations and that they remain Indian Country today. [5]

¶6 These reservations present a unique situation. Unlike many reservations where most residents are tribal members, the Cherokee, Chickasaw, and Choctaw reservations encompass large portions of eastern and southeastern Oklahoma, where non-Indians constitute the vast majority of the population. [6] Much of the land within these reservation boundaries is owned in fee by non-Indians, and the areas include major population centers. [7]

¶7 This demographic reality affects the allocation of regulatory authority. Under Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 212 (1978), tribes lack criminal jurisdiction over non-Indians absent specific congressional authorization. Accordingly, absent express congressional action to the contrary, the State necessarily retains authority to regulate non-Indians within these in-state reservation boundaries, including with respect to hunting and fishing. The question presented here, however, concerns the State's authority over Indians in Indian Country. [8]

III.
 DISCUSSION

¶8 This Opinion is limited in scope: It addresses only Indians, including Five Tribe Nonmember Indians, hunting and fishing in Indian country on lands covered by the Five Tribes Wildlife Management Reciprocity Agreement. It does not apply to the question of state or tribal jurisdiction over (1) non-Indians; (2) Indians who are not members of the tribes party to the Five Tribes Wildlife Management Reciprocity Agreement; or (3) Indians hunting or fishing on state-owned property within Indian Country. [9] See, e.g., Antoine v. Washington, 420 U.S. 194, 206 (1975) ("Non-Indians are, of course, not beneficiaries of the preserved rights [to hunt and fish on ceded land] and the State remains wholly free to prohibit or regulate non-Indian hunting and fishing").

¶9 With that said, the Opinion proceeds in two parts. First, it addresses why Stroble and Montana v. United States, 450 U.S. 544 (1981), do not govern the analysis here. Second, it explains why federal law does not allow enforcement of the Wildlife Code against Member Indians and Five Tribe Nonmember Indians hunting on the Nations' reservations.

A. Neither Stroble nor Montana Govern This Analysis.

¶10 You have asked for an analysis of Stroble, 2025 OK 48Stroble is inapposite because it addresses civil tax jurisdiction in a per curiam opinion declining to extend McGirt beyond criminal jurisdiction. It does not grapple with the key question here: whether federal law preempts state enforcement of hunting regulations over Indians on land the federal government promised them or on land where another tribe has invited them to hunt.

¶11 Similarly, Montana does not govern in resolving these questions. In Montana, the Supreme Court addressed the sources and scope of an Indian tribe's power to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians. 450 U.S. at 547. The Court held that although a tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe, the tribe has no power to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers[10] of the Tribe. Id. at 556--57.
Montana addressed tribal regulatory authority while this Opinion concerns state prosecutorial authority. These are distinct inquiries. Montana concluded that the Crow Tribe could not enforce its hunting regulations against non-Indians on fee land within the reservation. See id. at 565--66. This Opinion addresses whether Oklahoma can prosecute Indians who hold tribal licenses and are already subject to tribal regulation. The question of state authority is governed not by Montana but by Mescalero, which directly addresses preemption of state hunting and fishing laws.

B. Federal Law Preempts Application of the Wildlife Code to Indians on the Nations' Reservations.

¶12 Generally, Oklahoma's sovereignty does not stop at reservation borders. In Oklahoma v. Castro-Huerta, 597 U.S. 629 (2022), the Court explained:

[T]he Constitution allows a State to exercise jurisdiction in Indian country. Indian country is part of the State, not separate from the State. To be sure, under this Court's precedents, federal law may preempt that state jurisdiction in certain circumstances. But otherwise, as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country.

Id. at 636. Nevertheless, state jurisdiction in Indian Country may be preempted in two ways: (1) under ordinary principles of federal law, or (2) when state jurisdiction unlawfully infringes on tribal self-government. Id. at 637--38; White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980).

¶13 In O'Brien, 2024 OK CR 31Bracker analysis to determine whether it would impermissibly interfere with tribal self-government. See id. ¶ 19 (citing Castro-Huerta, 597 U.S. at 639 n.2).

¶14 The Supreme Court's decision in Mescalero, 462 U.S. 324, provides the framework for applying Bracker balancing where the state seeks to enforce its hunting laws over Indians in Indian Territory. There, the Supreme Court addressed whether New Mexico could enforce its hunting and fishing laws on the Mescalero Apache reservation, where the Tribe had, with the assistance of the federal government, established a comprehensive scheme for managing the fish and wildlife resources on its reservation. Id. at 328--29. The Court held that state law was preempted under Bracker balancing, which requires a particularized inquiry into the nature of the state, federal, and tribal interests at stake. Id. at 334, 343--44.

¶15 The Court emphasized that concurrent jurisdiction would effectively nullify the Tribe's authority to control hunting and fishing on the reservation, as it would empower the State to wholly supplant tribal regulations. Id. at 338. The Court held that where the governing body of an Indian Tribe--working closely with the Federal Government and under the authority of federal law--has exercised its lawful authority to develop and manage the reservation's resources for the benefit of its members, concurrent state jurisdiction is preempted. Id. at 343--44.

¶16 Applying this framework requires examining: (1) the tribal and federal interests at stake; (2) any state interests that might justify concurrent jurisdiction; and (3) whether the balance of these interests preempts state authority. See id. at 334 (citing Bracker, 448 U.S. at 145). Each consideration supports preemption here.

1. Tribal and Federal Interests.

¶17 Tribal interests weigh heavily in the balance. The Nations possess the right "to make their own laws and be ruled by them." Williams v. Lee, 358 U.S. 217, 220 (1959). They retain "the power of regulating their internal and social relations." Mescalero, 462 U.S. at 332 (citation omitted).

¶18 The Nations have exercised these rights through comprehensive wildlife codes establishing licensing requirements, seasons, and bag limits. [11] The Oklahoma Department of Wildlife Conservation ("ODWC") and the tribes have collaborated, including by sharing information, as evidenced by ODWC's inclusion of Choctaw Nation harvest data in its own reporting. [12] The Nations also maintain cross-deputization agreements with ODWC, allowing state game wardens to enforce tribal codes in tribal court, further demonstrating the cooperative framework that already exists. [13]

¶19 The Nations' codes address the same conservation objectives the State pursues, including species management, habitat protection, and sustainable harvest levels. [14] Federal law, including the treaties identified below, further reinforces tribal authority by recognizing the power of Indian tribes to self-govern and exercise criminal jurisdiction over all Indians in Indian Country. 25 U.S.C. § 1301(2).

¶20 The Nations have also exercised their inherent sovereign authority by entering into the Five Tribes Wildlife Management Reciprocity Agreement--executed among the Cherokee, Chickasaw, Choctaw, Muscogee (Creek), and Seminole Nations on July 11, 2024[15]--which establishes a mutual recognition framework demonstrating the Nations' capacity and commitment to coordinated wildlife management across reservation boundaries.

¶21 The United States owes the Nations "moral obligations of the highest responsibility and trust." Seminole Nation, 316 U.S. at 297. This includes the obligation to protect the sovereignty of each tribal government. 25 U.S.C. § 3601(2). Federal policy, as reflected in statutes, treaties, and executive action, consistently supports tribal self-governance and exercise of inherent tribal authority over internal matters. Id.; McClanahan v. State Tax Comm'n, 411 U.S. 164, 168--69 (1973). Wildlife management by tribes over Indians on tribal lands is a core exercise of that inherent sovereignty. And, after all, section one of the Oklahoma Enabling Act sets forth the federal interest in maintaining "federal and tribal jurisdiction over 'Indians, their lands, [and] property', except as extinguished by the tribes or the federal--not state--government." Indian Country, U.S.A. v. Oklahoma Tax Comm'n, 829 F.2d 967, 979 (10th Cir. 1987).

¶22 Notably, the Nations' treaties with the United States--including the Treaty of Dancing Rabbit Creek (1830), the Chickasaw Treaty of 1837, and the Treaty of New Echota (1835)--granted the Nations jurisdiction over their reservations and their citizens therein. [16] While these treaties do not expressly mention hunting and fishing, the Tenth Circuit has recognized such rights as part of the larger rights of possession inherent in reservation status. N. Arapahoe Tribe v. Hodel, 808 F.2d 741, 748 (10th Cir. 1987); see also Timpanogos Tribe v. Conway, 286 F.3d 1195, 1202 (10th Cir. 2002) ("Those rights include the hunting rights at issue in this case. 'As a general rule, Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress. These rights need not be expressly mentioned in the treaty.'") (quoting United States v. Dion, 476 U.S. 734, 738 (1986)). The Supreme Court has similarly held that hunting and fishing rights are normal incidents of Indian life included in lands conveyed as reservations. Menominee Tribe v. United States, 391 U.S. 404, 406 & n.2 (1968). [17] Hunting and fishing were integral to the traditional subsistence of the Cherokee, Chickasaw, and Choctaw peoples long before European contact and remained so through the treaty period. [18] This historical reliance reinforces that the treaty parties would have understood hunting and fishing as essential incidents of reservation life--rights retained rather than granted.

¶23 This treaty-based historical context underscores the tribal and federal interests weighing against state jurisdiction. The treaties reflect the federal government's solemn commitment to protect the Nations' authority to govern their territories and members--a commitment that informs the Bracker balance by demonstrating the depth and longevity of federal interests aligned with tribal self-governance. State wildlife enforcement against Indians on these reservations would be inconsistent with the relationship that the United States established through these treaties.

2. State Interests.

¶24 Under Puyallup Tribe v. Dep't of Game, 391 U.S. 392, 398 (1968), and its progeny, states may regulate on-reservation hunting and fishing only "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." The State cannot satisfy this standard by asserting a general interest in wildlife management; it must demonstrate additional functions or services performed by the State but not the Nations. Mescalero, 462 U.S. at 336.

¶25 Here, no state regulatory function or service justifies concurrent jurisdiction over Indians already subject to comprehensive tribal regulation. The Nations' comprehensive wildlife codes already address the same conservation objectives the State pursues, leaving no gap for state regulation to fill. [19] Any financial interest the State might have is "simply insufficient to justify the assertion of concurrent jurisdiction." Mescalero, 462 U.S. at 343 (finding "[t]he loss of revenues to the State is likely to be insubstantial given the small numbers of persons who purchase tribal hunting licenses.").

¶26 As applied to Indians on these reservations, the tribal and federal interests are at their apex: the Nations exercise congressionally recognized criminal jurisdiction over all Indians within their territories, 25 U.S.C. § 1301(2), and have established the comprehensive regulatory framework Mescalero requires. No state regulatory function or service justifies concurrent jurisdiction over Indians already subject to this comprehensive tribal regulation.

¶27 A question might arise whether the preemption analysis changes because much of the land within the Cherokee, Chickasaw, and Choctaw reservations is owned in fee by non-Indians rather than held in trust for the tribes. It does not. Federal law expressly provides that land within reservation boundaries remains Indian Country notwithstanding the issuance of any patent. 18 U.S.C. § 1151(a). Congress has thus determined that fee ownership does not remove land from the reservation or from Indian Country status. The relevant question is not who owns each parcel of land, but whether the comprehensive tribal regulatory framework described in Mescalero exists. The Nations' comprehensive wildlife codes apply throughout their reservations and satisfy that standard.

¶28 Accordingly, under Bracker and Mescalero, federal law preempts application of the Wildlife Code to Member Indians and Five Tribe Nonmember Indians hunting and fishing on the Nations' reservations. Applying the Wildlife Code directly conflicts with tribal regulatory authority by subjecting tribally authorized activities to state regulation and criminal penalties. See 29 O.S.2021, § 8-104Mescalero, 462 U.S. at 343--44.

C. The Reciprocity Agreement Does Not Alter This Analysis.

¶29 The Five Tribes Wildlife Management Reciprocity Agreement strengthens rather than weakens the case for preemption. Indians hunting or fishing on a Nation's reservation pursuant to a license from another signatory Nation remain subject to comprehensive tribal regulation--they must comply with the host Nation's wildlife code. The host Nation retains authority to enforce that code against Five Tribe Nonmember Indians. The Agreement thus ensures that all Indians hunting or fishing under its terms do so within the framework of tribal regulation, setting forth a comprehensive approach for conserving natural resources. Mescalero, 462 U.S. at 338--40.

¶30 The Agreement also demonstrates the Nations' commitment to coordinated wildlife management. By establishing uniform requirements across the signatory Nations' reservations, the Agreement ensures consistent regulation and conservation practices. And at its core, it ensures that all Indians hunting under its terms remain subject to the comprehensive tribal regulatory framework that Mescalero held preempts state jurisdiction.
 
¶31 It is, therefore, the official Opinion of the Attorney General that:

1. Federal law preempts application of the Oklahoma Wildlife Code to hunting and fishing on the Cherokee, Chickasaw, and Choctaw Nations' reservations by (a) Member Indians hunting on their own Nation's reservation and (b) Five Tribe Nonmember Indians hunting on a Nation's reservation pursuant to the Five Tribes Wildlife Management Reciprocity Agreement. [20]

2. Stroble and O'Brien do not compel a different conclusion. [21]

GENTNER DRUMMOND
ATTORNEY GENERAL

GARRY M. GASKINS, II
SOLICITOR GENERAL

BRADLEY CLARK
GENERAL COUNSEL

FOOTNOTES

[1] According to your request, your inquiries are limited to the Cherokee Nation ("Cherokee"), Chickasaw Nation ("Chickasaw"), and Choctaw Nation ("Choctaw"). The Cherokee, Chickasaw, and Choctaw may be collectively referred to as the "Nations."

[2] This Opinion does not address enforcement of the Wildlife Code on lands within the reservations that are owned by the State of Oklahoma. The State's interests are likely sufficiently strong on its own land to permit enforcement of the Wildlife Code against any person hunting or fishing there, including Indians.

[3] This office notes that there have been statements circulated by others in Oklahoma's government that the result reached in this Opinion means that Member Indians and Five Tribe Nonmember Indians will be permitted to engage in illegal hunting acts such as "spotlighting." This is demonstrably false. The Nations' codes ban practices such as "spotlighting." CHOCTAW NATION FISH, GAME & ANIMALS CODE, tit. 110, § 6.I (prohibiting headlighting and spotlighting from sunset to sunrise); CHEROKEE NATION TRIBAL CODE, tit. 29, § 103(C) (adopting the requirements governing hunting and fishing from the Wildlife Code); CHICKASAW NATION WILDLIFE REGS. ch. 4, § 4.00(3) (eff. Sept. 1, 2024) (making violations of the Wildlife Code that are not inconsistent with Chickasaw Nation law subject to an enforcement action).

[4] See Treaty of Dancing Rabbit Creek, 7 Stat. 333 (1830); Treaty of Doaksville, 11 Stat. 573 (1837); Treaty of New Echota, 7 Stat. 478 (1835).

[5] See State ex rel. Matloff v. Wallace, 2021 OK CR 21497 P.3d 686

[6] McGirt, 591 U.S. at 938--39 (Roberts, C.J., dissenting) (noting that the reservations "encompass[] the entire eastern half of the State--19 million acres that are home to 1.8 million people, only 10%-15% of whom are Indians.").

[7] See id.

[8] See 25 U.S.C. § 1301 (recognizing the power of Indian tribes to self-govern and exercise criminal jurisdiction over all Indians in Indian Country) and 18 U.S.C. § 1151(a) (defining "Indian country" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation").

[9] See supra note 2.

[10] A note on terminology: Montana uses "nonmembers" to describe anyone not enrolled in the regulating tribe--a category that includes both non-Indians and Indians enrolled in other tribes. This is distinct from the defined term "Five Tribe Nonmember Indian" used in this Opinion, which means an Indian enrolled in a tribe that is a party to the Five Tribes Wildlife Management Reciprocity Agreement who hunts or fishes on the reservation of another tribe that signed the same agreement.

[11] CHEROKEE NATION TRIBAL CODE, tit. 29, §§ 103(C), 106--107 (establishing Cherokee licensing and permit system with penalties); CHICKASAW NATION CODE, tit. 11, §§ 11-201, 11-301(2)(c), 11-302, 11-401 (Chickasaw wildlife regulations with enforcement provisions); CHOCTAW NATION FISH, GAME & ANIMALS CODE, tit. 110, §§ 5, 13--19, 22, 26--27 (Choctaw conservation measures and penalties).

[12] See ODWC, 2024--25 Big Game Harvest Report 21 (Aug. 29, 2025), https://www.wildlifedepartment.com/outdoorok/ooj/2024-25-big-game-harvest-report (noting "Choctaw Nation wildlife authorities conducted bear check-in for tribal members, accounting for seven (all archery) of the total 77 bears harvested").

[13] See State Addendum, Addition of State to Deputation Agreement for Law Enforcement in the Cherokee Nation, ODWC (Sept. 18, 2020); State Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Chickasaw Nation, ODWC (Jan. 15, 2021); State Addendum, Addition of State Agency to Deputation Agreement for Law Enforcement in the Choctaw Nation, ODWC (Mar. 2, 2021).

[14] See CHEROKEE NATION TRIBAL CODE, tit. 29, § 108(A) ("[T]he hunting and fishing rules of the Department of Wildlife Conservation shall apply to all Reservation Lands and Person[s] subject to the jurisdiction of the Cherokee Nation."); id. § 109(A) (the tribe's wildlife management plans "may incorporate the conservation requirements adopted by the State of Oklahoma"); id. § 114 ("The Principal Chief is authorized to negotiate and execute agreements with federal, state, local governments . . . to facilitate the purpose, policies, and requirements of this Code . . ."); CHICKASAW NATION CODE, tit. 11, § 301(2)(d) (Chickasaw Nation's wildlife provisions "promot[e] and manag[e] Wildlife within the Chickasaw Nation . . . by means of intergovernmental cooperation"); CHICKASAW NATION WILDLIFE REGULATIONS § 4.04 ("No person may take or harvest any species in excess of the bag limit for that species . . . [and] the bag limit prescribed under the Act shall be cumulative for all animals taken or harvested . . . irrespective of whether the animals have been taken or harvested within the Chickasaw Nation or elsewhere in the State of Oklahoma . . ."); CHOCTAW NATION FISH, GAME & ANIMALS CODE, tit. 110, § 30 ("Whosoever within the jurisdiction of the Choctaw Nation of Oklahoma is guilty of any act or omission which . . . would be punishable if committed or omitted within the jurisdiction of the State of Oklahoma . . . shall be guilty of a like offense subject to like punishment.").

[15] Five Tribes Wildlife Management Reciprocity Agreement (July 11, 2024), available at https://www.muscogeenation.com/wp-content/uploads/2024/07/20240712-Five-Tribes-Reciprocal-Wildlife-Agreement.pdf.

[16] See Treaty with the Choctaw (Treaty of Dancing Rabbit Creek), Choctaw-U.S., Sept. 27, 1830, art. IV, XX, 7 Stat. 333, 333--34, 38 (guaranteeing the Choctaw a "jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation" and granting "a rifle, moulds, and ammunition" likely as a means to hunt for food in the new locations); Treaty with the Choctaw and Chickasaw (Treaty of Doaksville), Chickasaw-U.S., Jan. 17, 1837, art. V, 11 Stat. 573, 574 (extending identical protections to the Chickasaw within the Choctaw Nation); Treaty with the Cherokee (Treaty of New Echota), Cherokee-U.S., Dec. 29, 1835, art. V, 7 Stat. 478, 481 (providing that Cherokee lands "shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory"). These provisions demonstrate the federal government's commitment to protecting the Nations' self-governance authority--a commitment that weighs heavily in the Bracker balance.

[17] Because federal preemption under Mescalero resolves this matter, this Opinion does not reach the separate question whether the Nations' treaties independently secure hunting and fishing rights within their reservations.

[18] The Cherokee, Chickasaw, and Choctaw were southeastern woodland peoples who supplemented agriculture with hunting and fishing for subsistence. Cherokee men hunted deer, turkey, bear, and other game, while fishing in rivers and streams provided additional protein; hunting was so central to Cherokee life that it required specific ceremonies and medicine. See Cherokee Hunting, Visit Cherokee Nation, https://visitcherokeenation.com/stories/cherokee-hunting/ (last visited Dec. 17, 2025). The Chickasaw "subsisted on hunting, fishing, gathering, and to a lesser extent than the Choctaw agriculture," with hunting parties ranging as far as the Great Plains. Chickasaw, Miss. Encyclopedia, https://mississippiencyclopedia.org/entries/chickasaw/ (last visited Dec. 17, 2025). The Choctaw similarly relied upon hunting and fishing for subsistence alongside their agricultural practices. See Choctaw Indians, Tex. State Hist. Ass'n Handbook of Texas, https://www.tshaonline.org/handbook/entries/choctaw-indians (last visited Dec. 17, 2025).

[19] See supra note 14.

[20] Under Oliphant, 435 U.S. at 212, tribes lack criminal jurisdiction over non-Indians. Because tribes cannot prosecute non-Indians who violate tribal wildlife codes, the State's regulatory interest with respect to non-Indians differs from its interest with respect to Indians.

[21] The Attorney General is the state's chief law officer and is entrusted with the duty of providing legal guidance to public officers and advising them on questions of law which relate to their official duties. This office's opinions are binding upon state officials affected by them, and they must follow and not disregard those opinions. Okla. Stat. tit. 74, § 18b; State ex rel. York v. Turpen, 1984 OK 26681 P.2d 763Hendrick v. Walters, 1993 OK 162865 P.2d 1232Rasure v. Sparks, 1919 OK 231183 P. 495Rasure, 1919 OK 231