897 P.2d 699

**ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellant,**

v.

**M. GREENBERG CONSTRUCTION, an Arizona corporation, Defendant–Appellee.**

**No. 1 CA–TX 93–0007.**

Court of Appeals of Arizona, Division 1, Department T.

Jan. 5, 1995.

Review Denied June 29, 1995.

Grant Woods, Atty. Gen. by Patrick Irvine, Asst. Atty. Gen., Phoenix, for plaintiff-appellant.

O'Connor, Cavanaugh, Anderson, Westover, Killingsworth & Beshears, P.A. by Glenn M. Feldman, Frank W. Moskowitz, Phoenix, for defendant-appellee.

## OPINION

TOCI, Judge.

This is an appeal by the Arizona Department of Revenue ("the Department") from a tax court judgment in favor of taxpayer, M. Greenberg Corporation ("Greenberg"). The tax court held that federal law preempted the Department's assessment of state prime contracting privilege taxes[1] on Greenberg's gross receipts from contracts for construction work it performed on the Navajo Reservation for Chinle Unified School District No. 24 ("the Chinle District") and Ganado Unified School District No. 20 ("the Ganado District") (collectively, "both Districts").

In this case, we address two issues. First, does federal law preempt state transaction privilege taxes imposed on an Arizona corporation's gross receipts from construction contracts with a state school district on the Indian reservation? Second, after acquiescing in the corporation's exclusion of similar receipts from its taxable business income in previous taxable years, is the state now precluded from assessing taxes on such gross receipts? We conclude that the tax court erred. We hold that state taxation of non-Indian activity on an Indian reservation is proper if the tax does not frustrate tribal self-government or contravene a comprehensive and pervasive scheme of federal regula-

---

1. Ariz.Rev.Stat.Ann. (A.R.S.) §§ 42–1301 through 42–1347 (1991 & Supp.1993).

tions. This tax does neither. Consequently, we reverse.

## I. FACTUAL AND PROCEDURAL HISTORY

Greenberg is an Arizona corporation with its main office located in Phoenix, Arizona. None of the shares of stock in Greenberg are owned by Indians. And, none of Greenberg's shareholders or officers live on the Navajo Indian Reservation.

Although located on the Navajo Indian Reservation and serving mainly Navajo children, the Ganado District and the Chinle District are political subdivisions of the State of Arizona, organized pursuant to A.R.S. sections 15–101 through 15–1241 (1991 & Supp. 1993). The Navajo Nation consented to the application of Arizona's compulsory school attendance laws and to the enforcement of such laws on any reservation land within an established school district. In the fiscal years 1986–87 and 1987–88, the percentages of the Chinle District's pupils who were Indians were 97 percent and 96 percent, respectively. For fiscal years 1986–87 and 1987–88, 98 percent of the students in the Ganado District were Indian.

During the years in question, the State of Arizona provided substantial support to public school districts on Indian reservations. Both Districts received funds from the state and from Apache County. Also, the Arizona Department of Education provided services in reviewing each school district's budget and notifying it when budget limits were exceeded, allocating federal monies, providing technical assistance to implement state programs, providing training for new programs, and providing assistance for school improvement. Additionally, the Arizona Auditor General's Office performed audits for Arizona public school districts, including both Districts, until 1986. After 1986, the Auditor General performed services specifically for both Districts in approving public school district contracts with outside auditors and the audits generated under such contracts.

Pursuant to the Federal Impact Aid Act, 20 United States Code ("U.S.C.") sections 236 through 246, Federal Impact Aid is paid to school districts that have within their boundaries government owned lands that produce no tax revenues. Both Districts are within the fifteen Arizona public school districts that are located on Indian reservations and receive funds from the United States government in the form of Federal Impact Aid. There are eighteen other Arizona public school districts that serve portions of Indian reservations and receive Federal Impact Aid. At least twenty more Arizona public school districts receive Federal Impact Aid because of the presence of military bases or other significant tracts of federal land within school district boundaries.

During fiscal year 1986–1987, the Chinle District received 26 percent of its total combined state, county, and federal funding from Federal Impact Aid. During the same fiscal year, the Ganado District received 40.3 percent of its total combined state, county, and federal funding from Federal Impact Aid. For the 1987–88 fiscal year, the corresponding percentage for the Chinle District was 48.4 percent, and for the Ganado District was approximately 35.3 percent.

Federal law did not require that Federal Impact Aid received by either the Chinle District or the Ganado District in fiscal years 1986–87 or 1987–88 be used for construction purposes. Revenue control and budget limits imposed under the provisions of Title 15, A.R.S., determined the manner in which both Districts allocated aid received from the State of Arizona and from Federal Impact Aid between expenses for maintenance and operations and expenses for capital improvements.

Both Districts obtained funds for construction of school improvements pursuant to state laws. The Chinle District issued school improvement bonds in 1985, and the Ganado District issued school improvement bonds in 1987, 1988, 1989, and 1991. These bonds were issued in part to raise funds for constructing, improving, and renovating school facilities. Additionally, A.R.S. section 15–962(F) (1991) permitted any school district to petition the State Board of Education for authority to budget and accumulate for school construction purposes a portion of the prior year's "ending cash balance." The

amount so budgeted and accumulated was not to exceed the amount of Federal Impact Aid monies the district was entitled to receive in the prior year. Both Districts petitioned the State Board of Education for such approval, and obtained it. Both Districts have used monies accumulated under A.R.S. section 15–962(F) to finance school construction expenses.

In 1982, the United States Supreme Court decided *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). Prior to this decision, Greenberg paid state transaction privilege taxes on its gross receipts from on-reservation construction work. After *Ramah*, Greenberg treated on-reservation school construction work as non-taxable.

In 1985, the Department examined Greenberg's books for the period of December 1981 through November 1984. The audit covered a number of on-reservation school construction projects, many of which were governed by contracts between Greenberg and the Bureau of Indian Affairs of the United States Department of the Interior ("BIA"). The Department's auditor agreed with Greenberg's position that its proceeds from these construction contracts were not subject to transaction privilege taxation. Additionally, on July 16, 1985, the Department refunded to Greenberg $31,221.32 it had previously paid as transaction privilege taxes on the proceeds of reservation contracting work after *Ramah*.

In 1987 and 1988, Greenberg executed the two contracts at issue here. The contract with the Chinle District for the construction of improvements at Chinle Elementary School, Chinle Junior High School, and Many Farms Elementary School was entered into on July 9, 1987. On May 10, 1988, the Ganado District signed a contract with Greenberg for additions and remodeling at Ganado Middle School. Greenberg asserts, supported by affidavits of district personnel, that the funds used for payments under the 1987 and 1988 construction contracts with both Districts can be traced exclusively to Federal Impact Aid payments. Greenberg did not report its gross receipts from those contracts to the Arizona Department of Revenue.

In 1988, the Department audited Greenberg for the period of December 1984 through July 1988. On Greenberg's gross receipts from both Districts' contracts, the Department issued a notice of deficiency in the amount $46,762.00 with interest. Greenberg protested the assessment before the Department. The Department's hearing officer sustained the assessment, holding that the Supreme Court's decision in *Ramah* did not compel the conclusion that federal law preempted the state's transaction privilege taxation of Greenberg's receipts from both Districts' contracts. On appeal, Division Two of the State Board of Tax Appeals disagreed and reversed.

The Department appealed to the Arizona Tax Court. On cross-motions for summary judgment, the tax court ruled in favor of Greenberg. The court reasoned, in part:

There are ... some attributes of these two school districts which distinguish them from most school districts in Arizona. 1) The student body consists almost entirely of Indians who are members of the Navajo Tribe. 2) These children reside on the Navajo Reservation. 3) The facilities constructed are on the Navajo Reservation. 4) The two school districts, though part of the Arizona school system, are largely funded by federal funds. All of these elements are cited in *Ramah* in support of its holding that the federal government has preempted the field of education of Indian children on Indian Reservations.

. . . .

... For the reasons set forth in *Ramah*, and by virtue of the authority of *Ramah*, the Court finds that the federal government has preempted the field of the education of Indian children on Indian Reservations.

These two school districts receive both state and federal funds. The parties do not seem to be in agreement as to exactly which source of funds provided the money to fund the construction performed by [Greenberg]. [Greenberg] argues that all of the money for the construction of the schools came from federal funds. The Department, however, argues that the federal

funds are earmarked for current expenditures and not capital projects.

While there may be disagreement as to the specific source of the funds used to pay [Greenberg], both parties appear to agree that, from whatever the source the money came, it reduced the amount of money available from that source for other expenses of the district. Money is fungible. The depletion of funds from one source is offset in part by funds from the other source. So, from whatever source came the funds to pay [Greenberg], federal funds for the education of Indian children on an Indian reservation were affected. It is an economic absolute that all transaction privilege taxes are paid by the ultimate consumer. In this case, the ultimate consumer is the school district. Thus, the payment of this tax by the contractor reduces the amount of federal money available for the education of Indian children on Indian reservations. The tax, therefore, is a burden imposed by the state in an area preempted by federal law.

After denying the Department's motion for reconsideration, the court entered formal judgment for Greenberg. The Department timely appealed.

## II. DISCUSSION

### A. Federal Preemption of Construction Contract Taxation

In *State ex rel. Arizona Department of Revenue v. Dillon*, 170 Ariz. 560, 826 P.2d 1186 (App.1991), this court stated the principles used for determining whether federal law preempts a state's exercise of authority over a non-Indian's activities on an Indian reservation. There, we relied upon the following language:

In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for *a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.*

*Dillon,* 170 Ariz. at 564, 826 P.2d at 1190 (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144–45, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) (emphasis added); *accord Dep't of Taxation & Finance of New York v. Milhelm Attea & Bros., Inc,* —— U.S. ——, ——, 114 S.Ct. 2028, 2035, 129 L.Ed.2d 52 (1994). Put another way, "[s]tate jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983); *accord Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1407–08 (9th Cir.1992).

The United States Supreme Court followed this approach in determining whether the state taxation in question in *Ramah* was preempted by federal law. There, the State of New Mexico closed an off-reservation public high school that had served the children of the Ramah Navajo Chapter of the Navajo Indian Tribe. *Id.* 458 U.S. at 834, 102 S.Ct. at 3396–97. To remedy the problem, the Ramah Navajo Chapter exercised its authority under the Navajo Tribal Code and established its own school board. *Id.* The Board, organized as a non-profit corporation, was a "tribal organization" under the provisions of 25 U.S.C. section 450b(c) and was operated exclusively by members of the Ramah Navajo Chapter. *Id.* With funds provided by the BIA and the Navajo Indian Tribe, the Board operated a school in the abandoned public school facility. *Id.*

The Board later sought federal assistance to construct its own school facility. *Id.* at 835, 102 S.Ct. at 3397. After obtaining a series of appropriations from Congress specifically earmarked for the construction of the school, the Board contracted with the BIA for the facility's design and construction. *Id.* "The contract specified that the Board was the design and building contractor for the project, but that the Board could subcon-

tract the actual construction work to third parties." *Id.* Lembke Construction Company was awarded the contract and commenced construction. Pursuant to industry practice, Lembke paid New Mexico gross receipts taxes on its contract payments and passed them through to the Board. *Id.* At first, Lembke and the Board paid these taxes but later protested their continued imposition. *Id.* at 836, 102 S.Ct. at 3397–98. The lower courts held for the New Mexico Bureau of Revenue. *Id.* The United States Supreme Court reversed.

The Supreme Court found that federal regulation of "the construction and financing of *Indian educational institutions*" was "both comprehensive and pervasive." 458 U.S. at 839, 102 S.Ct. at 3399 (emphasis added). The Court noted that during the 1970's, federal policy had shifted toward encouraging the development of Indian-controlled schools on the reservation. It stated:

> This federal policy has been codified in the Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 et seq., and most notably in the Self–Determination Act [Indian Self–Determination and Education Assistance Act, 88 Stat. 2203 (1975), 25 U.S.C. § 450 et seq.]. The Self–Determination Act declares that a "major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being." 88 Stat. 2203, as set forth in 25 U.S.C. § 450a(c). In achieving this goal, Congress expressly recognized that "parental and community control of the educational process is of crucial importance to the Indian people." 88 Stat. 2203, as set forth in 25 U.S.C. § 450(b)(3).

*Id.* at 840, 102 S.Ct. at 3400.

The Court recited at length the federal regulations concerning "school construction for previously private schools now *controlled and operated by tribes or tribally approved Indian organizations.*" 25 C.F.R. § 274.1 (1981) (emphasis added). It concluded:

> This detailed regulatory scheme governing the construction of *autonomous Indian educational facilities* is at least as comprehensive as the federal scheme found to be pre-emptive in White Mountain. The direction and supervision provided by the Federal Government *for the construction of Indian schools* leave no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts paid to Lembke by the Board. This burden, although nominally falling on the non-Indian contractor, necessarily impedes the clearly expressed federal interest in promoting the "quality and quantity" of educational opportunities for Indians by depleting the *funds available for the construction of Indian schools.*

458 U.S. at 841–42, 102 S.Ct. at 3400–01 (footnotes omitted) (emphasis added).

Rejecting the state's reliance on the absence of any express statement of Congressional intent to preempt the exercise of state authority, the Court said:

> In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax. Having declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the *comprehensive federal scheme intended to provide this education—a scheme which has "left the State with no duties or responsibilities."* Nor has the State asserted any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax. The only arguably specific interest advanced by the State is that it provides services to Lembke for its activities off the reservation. This interest, however, is not a legitimate justification for a tax whose ultimate burden falls on the tribal organization.
>
> . . . .
>
> We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest that these benefits are in any way related to the construction of schools on Indian land.

458 U.S. at 843–45 and 845 n. 10, 102 S.Ct. at 3401–02 and 3402 n. 10 (emphasis added) (citation omitted).

Here, the tax court missed the mark when it concluded that *Ramah* held "that the federal government has preempted the field of education of Indian children on Indian Reservations." Although similarities exist between this case and *Ramah*, the factors that dictated the result in *Ramah* simply do not exist here. Contrary to the analysis of both the tax court and Greenberg, *Ramah* did not base its preemption analysis on a general comprehensive and pervasive federal policy promoting Indian education. Rather, *Ramah*'s reference to federal Indian education policy is limited to the context in which it arose—that of a comprehensive, voluminous federal statutory and regulatory scheme for "encouraging the development of *Indian-controlled* institutions on the reservation." *Id.* at 840, 102 S.Ct. at 3399–3400. This was the objective that the *Ramah* Court found was frustrated by the New Mexico gross receipts tax. *Id.* at 843, 102 S.Ct. at 3401.

The essence of the tax court's analysis in the present case is that the tax here was passed through to both Districts, just as it was in *Ramah*, and the tax thus depleted funds available for the construction of schools that educate Indians. As stated by the tax court:

> [F]rom whatever source came the funds to pay the Taxpayer, federal funds for the education of Indian children on an Indian reservation were affected.... Thus, the payment of this tax by the contractor reduces the amount of federal money available for the education of Indian children on Indian reservations.

We find the tax court's reasoning erroneous for several reasons.

First, the *Ramah* Court's reference to "depleting the funds available for the construction of Indian schools," 458 U.S. at 842, 102 S.Ct. at 3401, must be viewed in the context of the facts before the Court in that case. The Ramah Navajo School Board, comprised exclusively of tribal members, was a "tribal organization" under federal law. *Id.* at 834, 102 S.Ct. at 3397. And, the school construction project was financed solely by BIA and Navajo Tribal Indian funds. *Id.* at 835, 102 S.Ct. at 3397. Furthermore, the government of New Mexico had entirely abandoned any effort to assist in educating Ramah Navajo children. *Id.* at 834, 102 S.Ct. at 3396–97.

In contrast, here both Districts are political subdivisions of the State of Arizona, for whose operation and maintenance the State provided the majority of the funding. Both Districts represent both Indian and non-Indian children. In both Districts, any qualified elector of the State could vote in school board elections, A.R.S. section 15–401 (1991), and any registered voter of the state residing in the district for one year prior such election could serve on the Board, A.R.S. section 15–421 (1991). Further, both Districts used their bonding and taxing powers to borrow funds for construction and improvement of school facilities before and during the times relevant to this litigation.

We acknowledge that both Districts did accumulate yearly capital surpluses up to the amounts of their Federal Impact Funds and used such accumulations for the construction projects on which Greenberg was prime contractor. Nevertheless, it is undisputed that state and local funds constituted the majority of the total funding that produced these capital surpluses, and such state and local funds were an integral, indivisible part of that funding. These state and local funds must therefore be viewed as having contributed proportionally to both Districts' construction expenditures, regardless of how officials from both Districts chose, for accounting purposes, to allocate such funds.

Second, and more fundamentally, in *Ramah* the depletion of "funds available for the construction of Indian schools" was significant for only one reason—it was the means by which the New Mexico tax operated to frustrate the federal purposes behind the legislation in that case. 458 U.S. at 843, 102 S.Ct. at 3401. The depletion of funds was not, as Greenberg and the tax court have concluded, a factor that the Court held sufficient in and of itself to invalidate the tax. *See generally Anderson v. Wisconsin Dep't of Revenue*, 169 Wis.2d 255, 484 N.W.2d 914, 917–21 (1992) (economic burden of state tax on tribe not sufficient to mandate preemption absent comprehensive federal regulatory scheme that leaves no room for additional

burden imposed by state law). Indeed, as the Supreme Court later stated in *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 175, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989):

> It is . . . clear that the tax immunity of the United States is shared by the Indian tribes for whose benefit the United States hold reservation lands in trust. Under current doctrine, however, *a State can impose a nondiscriminatory tax on private parties with whom the United States or an Indian tribe does business, even though the financial burden of the tax may fall on the United States or tribe.*

(Emphasis added) (citation omitted). This proposition applies with even more force here. Unlike the situation in *Ramah*, the public school districts bearing the burden of the tax in this case were neither Indian tribes nor tribal instrumentalities.

Greenberg notes that it was significant in *Ramah* that the State of New Mexico contributed nothing toward educating Indian children on the reservation. Greenberg asserts that the State of Arizona likewise expended none of its own money to fund the school construction projects that were the subject of Greenberg's contracts with both Districts. Greenberg argues, therefore, that the state "is not seeking tax revenues for the specific purpose of funding the construction of education facilities for Navajo children." Greenberg concludes that Arizona's only justification for the tax was a general desire to increase revenues, which the *Ramah* Court found insufficient to overcome the federal interest in that case. *See Ramah*, 458 U.S. at 845, 102 S.Ct. at 3402.

Nevertheless, *Ramah* is not analogous to this case. As we said above, the Arizona transaction privilege tax does not involve the specific federal regulatory interest against which the tax at issue in *Ramah* had to be weighed. Neither does it involve any similar federal interest. We therefore have no occasion to inquire into Arizona's "justification" for the tax imposed on Greenberg.

Further, unlike *Ramah*, it cannot be said that the State of Arizona gave nothing in return for the tax. As the Supreme Court stated in *Ramah*, 458 U.S. at 843 n. 7, 102 S.Ct. at 3401 n. 7, "This case would be different if the State were actively seeking tax

revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for Ramah Navajo children." Here, Arizona Department of Education funding and taxpayer-supported bonded indebtedness enabled both Districts to use all or part of their Federal Impact Aid funds for constructing new facilities or renovating or expanding existing ones. Moreover, such state and local funding largely supports the operation and maintenance of the Districts' facilities. Thus, in stark contrast to *Ramah*, here state funding assists substantially in the effort to provide adequate educational facilities for Indian children at both Districts.

Finally, as the Department observed below, the tax court's expansive interpretation of *Ramah* would effectively result in preemption of any state or local tax passed through to any state school district with Indians in its student body. The tax court's interpretation would also have the effect of preempting state income taxation of non-Indian employees of on-reservation school districts. In addition, it would preempt state sales taxes on purchases of school equipment and supplies by school districts serving Indian pupils. Caselaw, however, does not support the trial court's interpretation of *Ramah*. Principles of federal preemption of state authority over non-Indians on Indian reservations are simply not that broad. *See generally Sac & Fox Nation v. Oklahoma Tax Comm'n*, 967 F.2d 1425, 1429 (10th Cir.1992), *vacated on other grounds*, —— U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) ("[S]tate taxation of nonmember activity on a reservation is legitimate if the burden imposed on the tribe is minimal—if the tax does not frustrate tribal self-government or run afoul of Congressional enactments concerning the affairs of reservation Indians.").

Greenberg contends, however, that its preemption argument is supported by 20 U.S.C. sections 236 through 246, which provide for the Federal Impact Aid received by both Districts in this case. We disagree. Federal Impact Aid is not directed at promoting the education of Indian children on Indian reservations. The sole purpose of Federal Impact Aid is to make up revenues lost to school districts as a result of the presence of non-taxable blocks of federal land within their boundaries. Thus, there is no merit to

Greenberg's argument that a state transaction privilege tax on the gross receipts derived from reservation-based school construction "'impedes the clearly expressed federal interest in promoting the "quality and quantity" of educational opportunities for Indians.'" Answering Brief at 8 (quoting *Ramah*, 458 U.S. at 842, 102 S.Ct. at 3401).

We conclude the tax court erred in holding that federal law preempted application of the state transaction privilege tax to Greenberg's contracting revenues from the Chinle and Ganado Unified School Districts.

**B. Effect of Department's Post–1985 Change of Legal Position**

■ Finally, Greenberg contends that the tax court's judgment should be affirmed because it is fundamentally unfair for the state to "retroactively change its position with respect to a taxpayer's reporting or accounting methods after the Department has previously audited and approved the taxpayer's books and records." We cannot agree with Greenberg that this principle applies here. A change of position by the Department about whether a particular kind of income is legally subject to transaction privilege taxation is one thing—the Department's change of a reporting or accounting method for a multistate unitary business is quite another. The numerous reported decisions of the State Board of Tax Appeals cited by Greenberg on that point are therefore inapplicable.[2]

■ Nevertheless, taxing officials cannot waive revenues owed to the state by statute. *See Duhame v. State Tax Comm'n*, 65 Ariz. 268, 283, 179 P.2d 252, 261–62 (1947). "'[E]ven where there is a clear administrative practice of applying the taxing statutes in a certain manner, that practice does not mandate continued adherence where the taxing statute is clear and requires a different result.'" *Tucson Elec. Power Co. v. Arizona Dep't of Revenue*, 170 Ariz. 145, 150, 822 P.2d 498, 503 (App.1991) (quoting *Arizona Lotus*

*Corp. v. City of Phoenix*, 136 Ariz. 22, 24, 663 P.2d 1013, 1015 (App.1983)). Estoppel may succeed against the state only when its application would promote rather than frustrate the basic intent of the statute. *See Tucson Elec. Power Co. v. Arizona Dep't of Revenue*, 174 Ariz. 507, 516, 851 P.2d 132, 141 (App. 1992). The application of estoppel here would not promote the basic intent of the statute.

**III. CONCLUSION**

For the foregoing reasons, we reverse the tax court judgment entered in favor of the taxpayer and remand this case with directions to enter judgment for the Department.

CONTRERAS, P.J., and SHELDON, J. Pro Tem.*

---

2. *Walgreen Arizona Drug Co. v. Dep't of Revenue*, CCH Ariz.Tax Reports ¶ 200–789 at 11,011 (Ariz. B.T.A.Div. 2, Feb. 10, 1988); *Bobby McGee's U.S.A., Inc. v. Dep't of Revenue*, CCH Ariz.Tax Reports ¶ 200–780 at 10,990 (Ariz.B.T.A.Div. 2, Nov. 3, 1987); *McDonald's Corp. and Subsidiaries v. Arizona Dep't of Revenue*, CCH Ariz.Tax Reports ¶ 200–737 at 10,904 (Ariz.B.T.A.Div. 2, Feb. 5, 1987); *General Elec. Co. v. Arizona Dep't*

of Revenue, CCH Ariz.Tax Reports ¶ 200–590 at 10,707 (Ariz.B.T.A.Div. 2, June 15, 1983).

* The Honorable Steven D. Sheldon, Judge of the Maricopa County Superior Court, was authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. 6, § 31.