947 P.2d 836

STATE of Arizona, ex rel., ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellee,

v.

BLAZE CONSTRUCTION COMPANY, INC., Defendant–Appellant.

No. 1 CA–TX 96–0010.

Court of Appeals of Arizona, Division 1, Department T.

April 29, 1997.

Review Denied Dec. 16, 1997.*

Grant Woods, Attorney General by Patrick Irvine, Assistant Attorney General, Phoenix, for Plaintiff–Appellee.

Margrave, Celmins & Verburg by Gary Verburg, Phoenix, for Defendant–Appellant.

## OPINION

EHRLICH, Judge.

The Arizona Department of Revenue ("ADOR") assessed delinquent Arizona transaction privilege (contracting) taxes against taxpayer Blaze Construction Company. The taxes were computed on Blaze's gross proceeds from building roads for the United States Bureau of Indian Affairs ("BIA") on Indian reservations within Arizona. Blaze protested the assessment, arguing that federal law pre-empted application

* Martone, J., voted to grant the petition for review.

of the contracting tax. It prevailed in the administrative process.

ADOR then brought an action in the tax court, seeking to rein state the assessment. On cross-motions for summary judgment, ADOR prevailed and Blaze appealed to this court, presenting the following issues:

1. Whether Blaze's pre-emption claim necessarily fails given the absence of any federal statute that expressly pre-empted the imposition of state transaction privilege taxes on the gross proceeds from work performed for BIA;

2. Whether the tax court erred in holding that federal law did not impliedly pre-empt the imposition of the tax; and

3. Whether the tax court erred in denying Blaze's claim for credit against the assessment in the amount of Arizona contracting taxes paid by its subcontractors and suppliers.

## FACTS AND PROCEDURAL HISTORY

Blaze was incorporated under the laws of the Blackfeet Tribe of Oregon. *Blaze Construction. Co. v. Taxation and Revenue Dep't of New Mexico*, 118 N.M. 647, 884 P.2d 803, 804 (1994), *cert. denied* 514 U.S. 1016, 115 S.Ct. 1359, 131 L.Ed.2d 216 (1995). During the audit period of June 1, 1986, through August 31, 1990, under contracts with the BIA, it provided road-paving, grading, drainage, overlayment, marking and bridge-building services at locations on six Indian reservations within Arizona, those of the Navajo, Hopi, Fort Apache, Colorado River, Tohono O'Odham and San Carlos Apache Indian Tribes. These reservation roads provided access to Indian villages, Indian residences, tribal governmental buildings and other locations used by tribal members.

Each of the road-improvement projects that Blaze undertook for the BIA was funded with Federal Highway Administration ("FHA") funds. The authorization for the funding was the Federal Lands Highway Program, 23 U.S.C. § 204 (1994). That statute authorizes the United States Government to establish a coordinated program for highways on federal lands, including forest highways, public-lands highways, park roads, parkways and Indian reservation roads.

Annually, the BIA's Branch of Roads is told approximately what it will receive under the program for road construction. Over the period from 1989 to 1992, the annual figure was approximately $18 million for the Navajo area. The Navajo Nation has a roads committee that establishes priorities for roads and road-improvement projects. Using the Nation's priority list, the Branch of Roads decides the scope of each project and. the amounts of money to be allocated to each. Similar procedures are presumably followed in the other areas involved in this case.

The Branch of Roads issues a specification package for each project. Based on the package, the BIA's Design Section advertises for bids. The section maintains daily contact with the FHA concerning funding for the project. Once the FHA authorizes a preconstruction sum for the project, the BIA awards the contract.

Several of Blaze's contracts with the BIA provided for preconstruction meetings at the BIA's Phoenix office. Blaze used state roads to transport equipment from reservation to reservation in performing its BIA contracts. It paid Arizona motor vehicle registration fees, motor carrier taxes and use fuel taxes.

The State of Arizona did not participate in planning or developing any of Blaze's projects on reservations in Arizona. It issued no permits. It provided no inspection services related to employment, construction, quality or safety. It provided no maintenance or regular law-enforcement services on any of the reservation roads on which Blaze worked. The tribes provided all of the employment-referral services for each project. Some 85% of the workers whom Blaze employed on the projects are Indians.

State highway services are funded by appropriations from the Arizona Highway User Revenue Fund, the source for which is Arizona fuel taxes. ARIZ.REV.STAT. ANN. ("A.R.S.") §§ 28–1502, 28–1557. The state also receives funds through three federal programs for highway resurfacing, rehabilitation and restoration. It receives no more or less of these funds because the roads to which they pertain pass through Indian reservations. None of the portions of reserva-

tion roads on which Blaze worked under contracts with the BIA was among those for which the state was responsible to maintain, repair, resurface, rehabilitate or restore.

On May 21, 1993, ADOR issued a revised assessment of contracting privilege taxes against Blaze for the audit period June 1, 1986, through August 31, 1990. ADOR's hearing officer and, later, its director, rejected Blaze's protest on the merits. On administrative appeal, the Board of Tax Appeals vacated the assessment, holding that federal law pre-empted application of the contracting privilege tax to Blaze's BIA contract payments.

ADOR brought a refund action in the tax court pursuant to A.R.S. § 42–124(B) (Supp. 1996). The court held for ADOR, finding dispositive the decision in *Department of Revenue v. Hane Construction Co.*, 115 Ariz. 243, 564 P.2d 932 (App.1977), and Blaze appealed.

## DISCUSSION

A. *Applicability of Indian Law Pre-emption Analysis*

 Blaze contends that this case is governed by the implied preemption analysis that the United States Supreme Court has repeatedly applied to assertions of state authority over the activities of non-Indians on Indian reservations. It argues that this Indian law pre-emption analysis precludes the state from imposing contracting privilege taxes on the proceeds from Blaze's BIA contracts.

ADOR's initial response is that Indian law pre-emption analysis does not apply here at all. It argues that, because Blaze's contracts were with the BIA and not the affected tribes, a more general rule applies: State taxes will be deemed pre-empted only if they are imposed directly on the federal government or if a federal statute expressly preempts them. *See United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982). Relying on the decision of the New Mexico Supreme Court in *Blaze Construction*, 118 N.M. 647, 884 P.2d 803, ADOR claims that Indian law pre-emption analysis applies only when a state attempts to assert authority over the reservation activ-

ities of non-Indians who engage directly in commerce with reservation Indians.

The Supreme Court articulated the modern formulation of Indian law pre-emption analysis in *White Mountain Apache Tribe v. Bracker:*

> When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. [Citations omitted.] *More difficult questions arise where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.* In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence. *This inquiry* is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but *has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.*

448 U.S. 136, 144–45, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980) (emphasis added).

This formulation neither suggests nor implies that Indian law pre-emption analysis is inapplicable when the on-reservation activities of non-Indians over which the state seeks to exercise authority do not arise out of direct commercial relations with the tribe or a tribal entity. Moreover, nothing in the Court's application of that analysis in *White Mountain* suggests that it implicitly follows any such limitation. The identity of the nominal contracting party in fact played no part in the inquiry. The Court stated, for example:

> ... Respondents [including the State of Arizona] seek to apply their motor vehicle license and use fuel taxes on Pinetop [the taxpayer] for operations that are conducted solely on Bureau [of Indian Affairs] and tribal roads within the reservation. There

is no room for these taxes in the comprehensive federal regulatory scheme. In a variety of ways, the assessment of state taxes would obstruct federal policies. And equally important, *respondents have been unable to identify any regulatory function or service performed by the State that would justify the assessment of taxes for activities on Bureau and tribal roads within the reservation.*

\* \* \* \* \* \*

Respondents' argument is reduced to a claim that they may assess taxes on non-Indians engaged in commerce on the reservation whenever there is no express congressional statement to the contrary. That is simply not the law. In a number of cases we have held that state authority over non-Indians acting on tribal reservations is pre-empted even though Congress has offered no explicit statement on the subject. *The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits.*

*Id.* at 148–49, 150–51, 100 S.Ct. at 2586–87, 2587 (emphasis added; citations and footnote omitted). The Court's sole reference to a supposed dichotomy between the BIA and the tribe indeed runs contrary to ADOR's contention here. In a footnote to the first sentence of the passage quoted immediately above, the Court stated:

> In oral argument counsel for respondents appeared to concede that the asserted state taxes could not lawfully be applied to tribal roads and was unwilling to defend the contrary conclusion of the court below, which made no distinction between Bureau and tribal roads under state and federal law.... For purposes of federal pre-emption, however, we see no basis, and respondents point to none, for distinguishing between roads maintained by the Tribe and

roads maintained by the Bureau of Indian Affairs.

*Id.* at 148 n. 14, 100 S.Ct. at 2586 n. 14.

Moreover, neither ADOR nor the New Mexico court's opinion in *Blaze Construction* attempts to identify reasoning in any of the Court's other decisions which would support an exception to Indian law pre-emption analysis founded on the absence of direct commercial relations between the taxpayer and the tribe. Both the New Mexico court and ADOR rely principally on the facts from which those decisions happened to arise and not on their reasoning.

The New Mexico court in *Blaze Construction* further relies on the view that equating Indian tribes and the BIA improperly ignores tribal sovereignty. In our opinion, this view does not pertain analytically to the pre-emption question. It overlooks the focus of Indian law pre-emption analysis on the occurrence of non-Indian activities on an Indian reservation and the consequent potential that state taxation of those activities will conflict with federal or tribal interests reflected in federal law.

Even less to the point, ADOR argues that "[s]tate jurisdiction over tribes and tribal members can endanger the very existence of tribes, and courts will act to implement federal policy promoting the existence of tribes." ADOR forgets that the branch of Indian law pre-emption analysis that we consider here concerns assertions of state authority exclusively over non-Indians, not Indian tribes or their members.

In short, Blaze's challenge to the imposition of Arizona's transaction privilege tax on the gross proceeds from its contracts with the BIA can be resolved only by reference to Indian law preemption analysis as developed by the Supreme Court.

### B. Application of Indian Law Pre-emption Analysis

In *Hane Construction,* the taxpayer lined canals on the Colorado River Indian Reservation in accord with a contract with the BIA. 115 Ariz. at 244, 564 P.2d at 933. ADOR assessed contracting taxes against its gross proceeds from the job. *Id.* On

ADOR's appeal from summary judgment for the taxpayer, this court reversed, holding that a balancing of the rights of the federal government, the state and the reservation Indians revealed no implied federal pre-emption of the Arizona contracting tax as applied. *Id.* at 244–246, 564 P.2d at 933–935. In the instant case, the tax court found the decision in *Hane Construction* controlling.

Blaze assails the tax court's ruling on several grounds. It contends that *Hane Construction*, which predated *White Mountain*, necessarily failed to take into account the Indian law pre-emption analysis the Supreme Court adopted in that case and applied in those that followed it. According to Blaze, only the more recent Supreme Court cases have made clear that a state's assertion of authority over non-Indians on a reservation may be pre-empted despite the absence of an express federal pre-emption provision. Further, argues Blaze, it is only of recent origin that a state must justify burdening federal and tribal interests by showing that it performs an on-reservation regulatory function in connection with the specific activity it attempts to tax. Finally, Blaze contends that, in contrast to the taxpayer in *Hane Construction*, it has identified a specific federal regulatory scheme that Arizona's contracting tax impedes and specific tribal interests that the tax burdens.

■ Preliminarily, *Hane Construction*, which was decided on facts and issues identical to those in this case, had never been disapproved and, therefore, it was binding on the tax court. That court correctly left to the appellate courts the question whether *Hane Construction* remained good law in light of more recent cases.

Unlike the tax court, this court is free to reexamine *Hane Construction*. Having done so, we agree with Blaze that, no matter how close in point *Hane Construction* may appear to be to this case, Indian law pre-emption analysis has evolved through too many intervening Supreme Court decisions, and the surrounding legal environment has undergone too many intervening changes, for our resolution of this appeal to rest on *Hane Construction* alone. Our analysis must consider Indian law pre-emption doctrine at its current level of development. *See, e.g., Dep't of Taxation and Finance of New York v. Milhelm Attea & Bros.*, 512 U.S. 61, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989); *Ramah Navajo School Bd. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *White Mountain*, 448 U.S. at 136, 100 S.Ct. at 2579–80.

■ As we noted above, to test the validity of the state's assessment against Blaze, we must engage in "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain*, 448 U.S. at 145, 100 S.Ct. at 2584; *accord Milhelm Attea & Bros.*, 512 U.S. at 61, 114 S.Ct. at 2029–30; *State ex rel. Dep't of Revenue v. Dillon*, 170 Ariz. 560, 564, 826 P.2d 1186, 1189–90 (App. 1991). Restated more concretely, "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983); *accord Arizona Dep't of Revenue v. M. Greenberg Construction*, 182 Ariz. 397, 401, 897 P.2d 699, 703 (App.1995).

■ The first question we thus face here is whether the state's imposition of its privilege tax on Blaze's BIA contracting payments "interferes or is incompatible with" any federal or tribal interest reflected in federal law. *Mescalero*, 462 U.S. at 334, 103 S.Ct. at 2386. Blaze argues that imposition of the tax interferes with three distinct federal policies.

Blaze compares this case with *White Mountain* and *Ramah Navajo School Bd.* and argues that it is legally indistinguishable from either. Like the statutory provisions and regulations governing Indian-controlled, on-reservation schools in *Ramah*, Blaze contends that the BIA regulations concerning construction of reservation roads reserve to

that agency complete authority over on-reservation road improvement contracting, design, project selection, maintenance, use and policing. *Ramah,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174; *see generally* 25 C.F.R. §§ 170.1 through 170.9 (1996). It argues in addition that safe, passable roads are necessary to the success of the BIA's federally-mandated efforts to provide shelter, medical services, education and other social services to reservation Indians. Indeed, contends Blaze, the BIA road regulations are the same ones on which the Supreme Court in *White Mountain* held that Arizona's motor vehicle fuel and use fuel taxes were federally pre-empted. It urges that the imposition of Arizona contracting privilege taxes here is incompatible with the federal and tribal interest in channeling all available funding toward building and improving reservation roads.

Blaze further contends that imposing the Arizona contracting tax on payments under the BIA road-improvement contracts directly conflicts with the BIA's regulations under the Indian Self–Determination and Education Assistance Act, 25 C.F.R. §§ 271.1 through 271.5 (1996). It asserts that, under ADOR's view of this case, ADOR could not have imposed the state contracting tax on Blaze if the reservations' tribal authorities rather than the BIA had let the contracts in question. It points out that 25 C.F.R. § 271.4(d) and (e) express a federal policy in favor of leaving entirely to Indian tribes, free of sanctions, the decision whether to apply for contracts with the BIA to plan, conduct or administer BIA programs. *Accord* 25 C.F.R. § 271.1(d). Blaze argues that allowing the imposition of state privilege taxes on non-tribal members under contract with the BIA attaches an undesirable consequence to a tribe's decision not to seek to administer construction programs in the BIA's place by effectively reducing the road-improvement services that the tribes can receive in return for the available federal funding.

Blaze finally asserts, without contradiction by ADOR, that the BIA limits bidding on reservation-road programs to Indian-owned contractors and is not permitted to accord preferences based on bidders' affiliation with the tribe that controls the reservation where the work is to be done. *See* 25 U.S.C. § 47 (1994) (the Buy Indian Act). Blaze adds that ADOR has tacitly acknowledged that an Indian contractor living and working on his home reservation could not be subjected to the state contracting privilege tax. *See McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Blaze observes that, if ADOR may thus impose the contracting tax on a non-tribal member like Blaze but not on a competing reservation Indian, then it effectively inserts into the reservation road-improvement process a tribal affiliation preference of the kind that federal policy forbids. Blaze contends that imposition of the state contracting tax on non-tribal members who provide on-reservation services under contract with the BIA therefore conflicts with the BIA's implementation of the Buy Indian Act.

The unsuccessful taxpayer in *Hane Construction* made no such specific claims of incompatibility between the state's contracting tax and provisions of federal law.[1] To resolve these claims, we necessarily must go beyond the holding of that case.

ADOR answers Blaze's contentions by attempting to demonstrate that the applicable federal statutes neither express nor imply any congressional intent to pre-empt state taxation of federal contractors on Indian reservations. It notes that 23 U.S.C. § 204, which established the Federal Lands Highway Program, from which the BIA obtains funding for reservation road-improvement projects, expresses an intent that all federal roads and highways be treated under the same uniform policies. ADOR concludes from this expression of intent that Congress must have intended that federal contractors on Indian reservations be subject to state taxation to the same extent as all other federal contractors.

---

1. In *Hane Construction,* the court stated: "Although the appellee here has suggested that there are federal regulations or other provisions of law which expressly conflict with the imposition of the transaction privilege tax in this case, it has called no such specific regulations to our attention." 115 Ariz. at 244, 564 P.2d at 933.

We disagree with this analysis. Because 23 U.S.C. § 204 makes no mention of state taxation of federal contract proceeds, it does not support the view that Congress intended it to address this state taxation topic.

ADOR denies that the BIA's reservation-road regulations amount to a comprehensive federal scheme into which state taxing authority may not intrude. The Supreme Court's opinion in *White Mountain* belies that view. There the Court held that Arizona's imposition of motor vehicle fuel and use fuel taxes on a company that engaged in logging and hauling on a reservation under contract with the tribe was pre-empted by the applicable federal regulatory scheme. 448 U.S. at 147–48, 100 S.Ct. at 2585–86. This scheme included the BIA's comprehensive regulations governing the harvesting and sale of tribal timber and the Secretary of the Interior's "detailed regulations governing the roads developed by the Bureau of Indian Affairs. 25 C.F.R. Part 162 (1979) [now 25 C.F.R. Part 170 (1995) ]."

Further, ADOR does not directly respond to Blaze's analyses in support of its contention that imposing the Arizona contracting tax in this case conflicts with the Buy Indian Act and with the BIA's regulations under the Indian Self–Determination and Education Assistance Act. Indeed, ADOR does not address the Self–Determination Act at all. Concerning the Buy Indian Act, ADOR cites *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and the decision in *Dillon*, 170 Ariz. at 560, 826 P.2d at 1186, for the proposition that federal law permits states to treat non-members of the tribe occupying a reservation as non-Indians and therefore to tax them.

Again we disagree. The essence of the Buy Indian Act is to impose on the Secretary of the Interior, acting through the BIA, the duty to employ Indian labor as far as practicable and to purchase the products of Indian industry in his discretion. 25 U.S.C. § 47. The *Colville* and *Dillon* cases concerned on-reservation sales of cigarettes produced off-reservation by non-Indians. In neither case did the court consider how the Buy Indian Act might affect the legality of the state taxes challenged in those cases and ADOR does not attempt to explain how the facts of those cases, in which the BIA played no role at all, might have implicated the Buy Indian Act.

ADOR also disputes Blaze's contention that Arizona's imposition of the contracting privilege tax in this case adversely affected the reservation tribes' interests. It argues that Blaze's assertion that more miles of road would have been built were it not for the tax is speculative and unsupported by evidence. ADOR additionally cites *Gila River Indian Community v. Waddell*, 91 F.3d 1232 (9th Cir.1996), and our decision in *M. Greenberg Construction*, 182 Ariz. 397, 897 P.2d 699, for the proposition that a state may impose a non-discriminatory tax on a non-Indian with whom the United States Government or a tribe does business, even though the economic burden of the tax may fall on the government or the tribe. ADOR argues that, "even if there was some economic harm to the tribes here, that harm without more is insufficient to defeat the tax."

Both *Gila River*, 91 F.3d at 1237, and *Greenberg*, 182 Ariz. at 404, 897 P.2d at 706, on which ADOR relies, based their analyses on language in *Cotton Petroleum*, 490 U.S. at 163, 109 S.Ct. at 1700–01. An examination of *Cotton Petroleum*, however, reveals that ADOR misplaces its reliance on *Gila River* and *Greenberg* under the circumstances before us here.

In *Cotton Petroleum*, the Court held that a New Mexico tax on on-reservation oil production was not pre-empted under Indian law pre-emption analysis. It found that the state tax was not incompatible with the applicable federal statutes, and it distinguished both *White Mountain* and *Ramah* on the basis that the federal regulatory schemes applicable in those cases were comprehensive, the economic burden of the taxes fell on the tribes and the taxing authorities had asserted no legitimate regulatory interests that might justify the challenged taxes. However, the Court noted that the state regulated the spacing and mechanical integrity of the reservation oil wells, the production from which was subjected to the challenged tax.

We thus conclude that federal law, even when given the most generous construction, does not pre-empt New Mexico's oil and gas severance taxes. *This is not a case in which the State has had nothing to do with the on-reservation activity, save tax it.* Nor is this a case in which an unusually large state tax has imposed a substantial burden on the Tribe. *It is, of course, reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate. Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, is simply too indirect and too insubstantial to support Cotton's claim of pre-emption.* To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, *absent some special factor such as those present in Bracker and Ramah Navajo School Bd.,* would be to return to the pre–1937 doctrine of intergovernmental tax immunity. Any adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the state tax. Absent more explicit guidance from Congress, we decline to return to this long-discarded and thoroughly repudiated doctrine.

490 U.S. at 186–87, 109 S.Ct. at 1713 (emphasis added).

In contrast to *Cotton Petroleum, Gila River* and *Greenberg,* this is not a case in which Arizona can correctly claim to have had anything to do with the "on-reservation activity," in this case building and improving reservation roads, other than taxing it. The BIA's road regulations, 25 C.F.R. §§ 170.1 through 170.9, give state officials no automatic role in planning, surveying, designing, constructing, repairing, using or maintaining the BIA roads on Indian reservations. The sole reference to state participation in those processes is in 25 C.F.R. § 170.7 (1995), which allows the BIA to solicit agreements for the states' voluntary cooperation in building and maintaining certain roads and bridges, "especially at those locations where road projects serve non-Indian land as well as Indian land."

■ The record in this case reveals no such agreement with Arizona. Further, ADOR makes no claim that the state provided regulatory or other services related to improving, maintaining or using any of the reservation roads at issue here. Instead, ADOR's position is that it need not have provided services directly related to the on-reservation activity subject to taxation to establish a state interest "sufficient to justify the assertion of State authority." *Mescalero Apache Tribe,* 462 U.S. at 334, 103 S.Ct. at 2386. ADOR argues that Arizona's activities in maintaining and repairing major highways that allow access to the BIA roads, its expenditure of significant sums that assist school districts in educating reservation residents [2] and the general governmental services it provides to Blaze off the reservations, adequately established such an interest under Indian law pre-emption analysis. It relies on *Gila River,* 91 F.3d at 1232, *Salt River Pima–Maricopa Indian Community v. State of Arizona,* 50 F.3d 734 (9th Cir.), *cert. denied* 516 U.S. 868, 116 S.Ct. 186, 133 L.Ed.2d 123 (1995), and the New Mexico Court's decision in *Blaze Construction,* 884 P.2d at 803.

*Salt River* fails to support the proposition for which ADOR cites it. The contention that the Ninth Circuit rejected in that case was not that the state had to perform a regulatory function or service in connection with the on-reservation activity to acquire an interest sufficient to tax it. The taxpayer's contention was, instead, that the tax was invalid unless the state provided services to the reservation tribe that were "proportional" to the state taxes generated by the on-reservation activities. 50 F.3d at 737–38. Contrary to ADOR's implication, this contention presupposed nothing about the existence of a direct connection between the state's governmental services and the taxpayer's on-reservation activities. It promoted instead

**2.** The state additionally provides considerable funding and many services to public school districts in Arizona, including those wholly or partly on Indian reservations.

the view that, to collect the challenged state taxes, the state had to show that it provided the tribe with services of roughly equivalent value in return. The court in *Salt River* correctly rejected this contention based on language in Part IV of *Cotton Petroleum,* which addressed the tax payer's distinct argument in that case that the tax violated the Due Process and Indian Commerce Clauses of the United States Constitution. *Salt River,* 50 F.3d at 737–738.[3]

Later on, however, summarily and without explanation, a different panel of the Ninth Circuit drew *Salt River*'s analysis of the proportionality contention into its own analysis of a distinct Indian law pre-emption issue. *Gila River,* 91 F.3d at 1232, 1239. The court in *Gila River* presented *Salt River*'s quotation from the Indian Commerce Clause discussion in *Cotton Petroleum* as if the court in *Salt River* had invoked that language to reject a contention in the tribe's pre-emption analysis "that there be a direct connection between the state sales tax revenues and the services provided to the Tribe...." *Id.* at 1239. As we observed above, however, the tribe in *Salt River* made no such contention and the court expressed no view on that point.

The New Mexico Supreme Court employed the same misinterpretation of *Cotton Petroleum* in *Blaze Construction,* 884 P.2d at 808–09. This misunderstanding formed the basis on which the court rejected the conclusion of its intermediate appellate court that New Mexico provided insufficient regulatory or other services in connection with Blaze's on-reservation activities in that state to justify taxing Blaze's proceeds.

The Court [of Appeals] first erred by holding that the state gross receipts tax

was preempted because "the State has identified absolutely no interest in the [roadconstruction] activity." *Id.* [871 P.2d at 1371]. As part of the preemption analysis, *Bracker* and *Ramah* both held the state must identify a regulatory function or service performed that would justify the tax. *Ramah,* 458 U.S. at 843–44 [102 S.Ct. at 3401–02]; *Bracker,* 448 U.S. at 150 [100 S.Ct. at 2587]. Both cases held that the state's general interest in raising revenue through taxes was not sufficient justification for imposing the tax. *Ramah,* 458 U.S. at 845 [102 S.Ct. at 3402]; *Bracker,* 448 U.S. at 150 [100 S.Ct. at 2587]. However, *Cotton Petroleum* abandoned the quid pro quo theory of taxation articulated in *Bracker* and *Ramah.* In *Cotton Petroleum,* the Court rejected the corporation's argument that "tax payments by reservation lessees far exceed[ed] the value of services provided by the State to the lessees." 490 U.S. at 189 [109 S.Ct. at 1714]. The Court noted that "the relevant services provided by the State include those that are available to the lessees and the members of the Tribe off the reservation as well as on it." *Id.*

\*　　\*　　\*　　\*　　\*　　\*

Applying *Cotton Petroleum* to *Blaze* and *Arco,* we conclude that it was irrelevant that the state did not identify specific services or regulatory functions provided in exchange for taxes collected. Taxes are not imposed in exchange for services provided. Instead, taxes are a means of distributing the cost of government among the general population, including its Indian citizens. The state thus had an interest in taxing for the common good—i.e., the welfare of its entire populace, Indian and non-

---

**3.** The Court stated:

 ... [T]here is no constitutional requirement that the benefits received from a taxing authority by an ordinary commercial taxpayer—or by those living in the community where the taxpayer is located—must equal the amount of its tax obligations.

\*　　\*　　\*　　\*　　\*　　\*

 Cotton, in effect, asks us to divest New Mexico of its normal latitude because its taxes have "some connection" to commerce with the Tribe. The connection, however, is by no means close enough. There is simply no evi-

dence in the record that the tax has had an adverse effect on the Tribe's ability to attract oil and gas lessees. It is, of course, reasonable to infer that the existence of the state tax imposes some limit on the profitability of Indian oil and gas leases—just as it no doubt imposes a limit on the profitability of off-reservation leasing arrangements—but that is precisely the same indirect burden that we rejected as a basis for granting non-Indian contractors an immunity from state taxation.... 490 U.S. at 190–91, 109 S.Ct. at 1715 (citations omitted).

Indian alike. We hold that the interest in raising revenue was sufficient to justify levying the gross receipts tax on Blaze and Arco. We hold that the Court of Appeals erred by disregarding *Cotton Petroleum* and holding that state taxes must be directly linked to a state interest in the activity being taxed.

*Id.*

Contrary to the court's analysis in *Blaze Construction*, the Court in *Cotton Petroleum* did not equate the "quid pro quo theory" with the distinct contention that a state cannot tax on-reservation activities of non-Indians unless it provides regulatory or other services related to those activities. *Compare Cotton Petroleum* Part III, 490 U.S. at 176–87, 109 S.Ct. at 1707–13 *with Cotton Petroleum* Part IV, 490 U.S. at 187–91, 109 S.Ct. at 1713–15.

More importantly and again contrary to the court's holding in *Blaze Construction*, the Court in *Cotton Petroleum* did not abandon the requirement of *White Mountain* and *Ramah* that there exist a relationship between the services the state provides and the on-reservation activities it seeks to tax. In *Cotton Petroleum*, the taxpayer argued that the state's oil and gas severance taxes interfered with applicable federal laws and policies, and that the state's responsibilities in connection with the taxpayer's on-reservation activities, in comparison to the responsibilities of the tribe, were "significantly limited." 490 U.S. at 177, 109 S.Ct. at 1708.

The Court found no implied intent to pre-empt state taxation of non-tribal member lessees in the applicable federal law. It further observed that, in *White Mountain*, it had held that the state had been "unable to identify any regulatory function or service (it) performed ... that would justify the assessment of taxes for activities on [BIA] and tribal roads within the reservation." *Cotton Petroleum*, 490 U.S. at 184, 109 S.Ct. at 1711. The Court additionally noted that, in *Ramah*, it had concluded: "Having declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme

which has left the State with no duties or responsibilities." *Cotton Petroleum*, 490 U.S. at 185, 109 S.Ct. at 1712 (citations omitted).

The Court pointed out that, in contrast to those cases, the state provided the taxpayer and the tribe with substantial services, and "regulate[d] the spacing and mechanical integrity of wells located on the reservation." *Id.* at 185–86, 109 S.Ct. at 1712. It stated that the case before it was not one "in which the State has had nothing to do with the on-reservation activity, save tax it." *Id.* at 186, 109 S.Ct. at 1713. The Court held that, absent this "special factor" present in both *White Mountain* and *Ramah*, the "indirect," "insubstantial" economic effect that the state tax had on the tribe would not support a finding of pre-emption. *Id.* at 187, 109 S.Ct. at 1713. In contrast, here the services which the state provides to Blaze and to tribal members, substantial though they may be, have no direct connection either to Blaze's on-reservation road-construction and improvement activities or to the maintenance or use of those roads after Blaze's work on them is finished.

We thus agree with Blaze that the circumstances in this case are legally indistinguishable from those in *White Mountain*. The field of on-reservation activity that the state seeks to tax is governed by comprehensive federal regulations. Indeed, the road-building and improvement regulations that apply in the instant case are among those on which the Court in *White Mountain* in part based its finding of pre-emption. As it stated:

... [T]his is not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall. Nor have respondents been able to identify a legitimate regulatory interest served by the taxes they seek to impose.... [W]e are unable to discern a responsibility or service that justifies the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads.... The roads at issue have been built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors. We do not believe that

respondents' generalized interest in raising revenue is in this context sufficient to permit its proposed intrusion into the federal regulatory scheme....

448 U.S. at 150, 100 S.Ct. at 2587.

We distinguish our decision in *Pimalco v. Arizona Department of Revenue*, 188 Ariz. 550, 937 P.2d 1198 (App.1997). In that case, we rejected the taxpayers' contention that imposition of the state's ad valorem property tax on their leasehold interests in tribal land was pre-empted by federal law. *Id.*, 188 Ariz. at 555, 937 P.2d at 1203. Although the taxpayers relied on *White Mountain*, they failed to offer "the particularized examination of the relevant state, federal, and tribal interests" that the case requires. *Id.* Our opinion in *Pimalco* did not attempt to fill that void. Analogous decisions instead formed the basis for its holding that no conflict existed between the state tax and federal regulation of leaseholds in Indian trust land.

Additionally, in rejecting the taxpayers' related contention that application of the state tax interfered with tribal self-government, in *Pimalco* we referred to regulatory and other services not specific to the leasing of tribal trust land that the state provided to the taxpayers and the tribe. Unlike the situation in this case, the question whether such generalized state governmental services are material to Indian law pre-emption analysis was not raised in *Pimalco* and, therefore, the opinion in that case should not be read to address or resolve that question.

We conclude that the holding in *Hane Construction*, 115 Ariz. 243, 564 P.2d 932, has been superseded by governing federal case law and is no longer authoritative. We also determine that the analysis in *Blaze Construction*, 118 N.M. 647, 884 P.2d 803, is unpersuasive. We hold (1) that the principles of Indian law pre-emption analysis apply in this case even though Blaze's contracts for on-reservation road improvements were let by the BIA rather than by the affected tribes and (2) that those principles require us to conclude that imposition of Arizona's contracting privilege tax on Blaze was impliedly pre-empted by federal law and therefore of no legal effect.

## CONCLUSION

The judgment is reversed. This case is remanded to the tax court with directions to enter judgment for Blaze.

NOYES, P.J., and GERBER, J., concur.